Kalman GREENHILL, Frank Proctor, Jr., a/k/a Francis E. Proctor, Appellants,

v.

UNITED STATES of America, Appellee.

No. 18439.

United States Court of Appeals Fifth Circuit.

Jan. 25, 1962.

Rehearing Denied March 27, 1962.

Karl B. Friedman, Birmingham, Ala., Dudley Yoedicke, Leon D. Hubert, Jr., Hubert, Baldwin & O'Hara, New Orleans, La., Louise S. Korns, New Orleans, La., on the brief, for appellants.

W. L. Longshore, Macon L. Weaver, U. S. Attys., M. L. Tanner, Asst. U. S. Atty., Birmingham, Ala., David B. Bliss, Atty., Securities and Exchange Commission, Washington, D. C., for appellee.

Before RIVES, CAMERON, and BELL, Circuit Judges.

GRIFFIN B. BELL, Circuit Judge.

■ This consolidated appeal comes to us on a record of 1,999 pages together with more than 300 exhibits. It is from final judgments and sentences imposed upon a jury verdict finding appellants guilty on nine counts of using the mail to defraud [1] and ten counts of fraud in the sale of securities by the use of the mails [2] in that they willfully devised a scheme to defraud certain persons named in the indictment by inducing them through false representations to buy subordinated debenture bonds or short term notes issued by Alabama Acceptance Corporation. Appellant Greenhill was sentenced to three years and Appellant Proctor to two years in the Federal Penitentiary.

Despite the mass of testimony, the multitudinous exhibits and the unusual length of the trial, this story can be simply told. In March of 1956, John Murray, who was jointly indicted with appellants and who entered a plea of nolo contendre on the day trial commenced [3] acquired control of Alabama Acceptance Corporation, an Alabama corporation with its principal place of business in Birmingham by buying for $12,500 in notes all of the outstanding stock of Beech Investment Company, Inc., an Alabama corporation which owned fifty one percent of its capital stock. Murray became chief executive officer of Alabama Acceptance, an automobile finance company which was losing money when he bought it. [4]

John Murray was advised by Milton Linn of Miami, Florida to get in touch with Appellant Greenhill, a New York attorney but more recently doing financial consulting, about the financial problems of Alabama Acceptance Corporation. Murray made an appointment to see Greenhill at his two room office located at 1407 Broadway in New York on the condition that he pay Greenhill a retainer fee of $1,000. Greenhill later borrowed $5,500 from Alabama Acceptance Corporation to pay Mr. Linn as a brokerage fee for referring Murray to him. At any rate, upon payment of the $1,000 retainer fee Greenhill conferred with Murray and his accountant Williams for some hours, advising that he could not help them in the automobile financing business but suggested that Alabama Acceptance Corporation undertake a program of acquisition of other companies. Greenhill offered his assistance in such a program and that of his

---

1. Title 18 U.S.C.A. § 1341 makes it a crime to use the mails in furtherance of a scheme to defraud or to obtain money or property by means of false or fraudulent representations.

2. Title 15 U.S.C.A. § 77q(a) (1) makes it unlawful, and subject to the penalties set out in Title 15 U.S.C.A. § 77x, in the sale of securities by the use of the mails to employ any device, scheme or artifice to defraud.

3. Carl K. Welles and William Edward Faulk, securities salesmen for Alabama Acceptance Corporation were also jointly indicted and entered pleas at the same time.

4. Defendant's Exhibit 141, an audit report, showed losses for the eight months' period ending February 29, 1956 of $44,904.53 and losses for the month of February alone of $11,680.94. The earned surplus as of June 30, 1955 was $52,823.02 but the losses together with dividends paid on common and preferred stock had reduced the earned surplus as of February 29, 1956 to $68.85. This statement showed capital funds of $97,375.00 in six and eight percent ten year subordinated debentures, $162,810 in preferred stock and $1.00 in common stock which together with earned surplus made a total of $260,254.85.

associate, Appellant Proctor, an engineer whose experience had been mainly in sales; Proctor to act as an industrial broker in finding and evaluating businesses for sale and Greenhill to negotiate the terms, conditions and financing of the transactions.

Here it should be noted that Greenhill and Proctor had for some months been associated under the style of Frank Proctor & Associates as industrial brokers. Their motivation was to earn finders fees by putting those who wanted to sell in touch with those who wished to purchase with negotiation then to be done by the would-be sellers and purchasers. In short, they knew of industries for sale and could find others and Alabama Acceptance Corporation was to become a captive purchaser.

Proctor occupied the extra office in the suite of Greenhill and he also met for a short time with Murray and Williams. This was on or about June 19, 1956. A few days later Mr. Greenhill met with John Murray in Birmingham to discuss the matter further. The long and the short of this meeting was that it was agreed that Greenhill and Proctor would undertake an acquisition program for Alabama Acceptance on conditions to be agreed upon. Greenhill while in Birmingham on this trip borrowed $3,000 from Alabama Acceptance Corporation.

In July 1956 Greenhill and Proctor chartered Frank Proctor & Associates, a New York corporation. Greenhill was never an officer of Alabama Acceptance, Frank Proctor & Associates or any of the other related corporations. Proctor was president of Associates and became a director of Alabama Acceptance. Greenhill stated to Murray at the first meeting in New York that he could not occupy any foreground position in any undertaking because of, among other reasons, his tax difficulties and previous bankruptcy.

Murray, Proctor, and Greenhill as individuals, Roland Industries, Inc., a corporation owned by Mr. and Mrs. Greenhill, and Frank Proctor & Associates entered into an agreement during the same month to the effect that Alabama Acceptance Corporation would enter into an acquisition program whereunder companies would be submitted to it for purchase by Greenhill, Proctor, Roland Industries, and Associates which program was to last for three years. A commission equal to five percent of the purchase price was to be paid to the person or firm submitting the proposal at the time title to the stock being purchased passed to Alabama Acceptance Corporation. Thereafter this agreement was modified to the extent that Alabama Acceptance engaged the services of Frank Proctor & Associates as financial and management consultants in connection with the corporations and properties acquired and to be acquired and agreed to pay Associates for these services a sum equal to five percent of the total purchase price plus $100 per week from each subsidiary which it controlled, plus a sum equal to twenty five percent of net profits of Alabama Acceptance before taxes. Then in 1957 but retroactive to June 18, 1956, Murray, Proctor, and Greenhill entered into an agreement in which it was recited that Beech Investment Company owned control of Alabama Acceptance Corporation and that Murray owned fifty one percent of the stock of Beech and that Frank Proctor & Associates had an agreement to purchase the remaining outstanding forty nine percent of the stock of Beech and that they had formed various other corporations since June 18, 1956 and others would be formed in the future. They then agreed that with the exception of Alabama Acceptance and Beech the three of them would own one third each of every other corporation organized including Frank Proctor & Associates, Inc., a New York corporation; Frank Proctor & Associates, Inc., a Florida corporation; Alabama Capital Corporation, a New York corporation; Central Capital Corporation, a Florida corporation; and Allen Capital Corporation, a New York corporation. They agreed also that in regard of these holdings and all future

holdings all increments, dividends, additional issues or incomes, or income or property received by any of the companies or by either of the parties as commissions or broker fees or any other compensation would be divided equally amongst the three, and all of this was to be true notwithstanding the manner in which the holdings might be reflected on the records of any of the companies. Lastly, in this agreement it was specified that each would be employed for a period of ten years from June 18, 1956 to devote full time and attention to the interest of all companies covered in the agreement with Murray and Proctor to receive $25,000 per year and Greenhill to receive $50,000.

Appellants, in cooperation with Murray, then set out on an acquisition program. The pattern of acquisition was a small down payment and a large mortgage whether acquiring stock or assets, with emphasis on assets, and with little or no regard being given to the profit record of the companies being acquired. Only one subsidiary prospered. Companies were acquired publishing small newspapers, operating printing plants, and manufacturing water heaters, radar parts, and parts for aircraft and missiles as well as electric fans. Many companies were investigated and not purchased and in three instances options were purchased but final acquisition did not take place. In one of these Frank Proctor & Associates collected a fee of $25,000 which was never repaid to Alabama Acceptance although the refund was carried on the books of Alabama Acceptance as an account receivable.

The key to the arrangement or plan contrived by appellants and Murray was profits to Frank Proctor & Associates which was in turn paid out to appellants in salaries, expense accounts, and loans. These came through the medium of the agreed finders or brokerage and management fees. The contract as to management fees was disregarded. For example, one subsidiary was paying Associates on the basis of $15,000 per annum.

In the fiscal year ending June 30, 1957, Associates had an income of approximately $96,000, virtually all of which came from Alabama Acceptance in connection with the acquisition program. Proctor was paid $24,500 and Greenhill $53,000 in salary out of Associates for this period. This did not include loans to Greenhill from Alabama Acceptance or Associates. Loans also were necessarily made to Associates so that salaries and expenses could be paid as Associates, according to its federal income tax returns had liabilities exceeding assets by more than $30,000 as of the end of the fiscal year. The capital account was only $1,500 and losses were over $30,000. Greenhill was not an officer of Associates but was working under the salary agreement with Murray and Proctor. Proctor was President of Associates.

Greenhill and Proctor prospered to the extent that they moved out of the small offices on Broadway to Madison Avenue where they occupied a spacious suite complete with reception room and conference room. Greenhill was spending a substantial amount of time at the Eden Roc and Americana Hotels at Miami Beach, Florida with Alabama Acceptance and Associates each reimbursing him for forty percent of his expenses. His purpose in being there was to make contacts and on one occasion reported that he had obtained a $25,000 line of credit for one of the subsidiaries through one of his contacts there. He was also supervising the sale of securities in that area.

Alabama Acceptance Corporation and all of its subsidiaries were dominated by Murray, Proctor, and Greenhill during this period of the acquisition program insofar as the program and the financing was concerned. Funds were needed to keep the program going and plans and efforts were intensified to sell long term debentures and short term notes to the investing public. Murray and Proctor were concentrating on Alabama while Greenhill was lending his efforts to the Miami area. Welles was the Sales Manager in Alabama under Murray and

Proctor while Faulk was in charge of sales under Greenhill in the Miami area. Alabama Acceptance Corporation, even before it was acquired by Murray had engaged in selling long term debentures to the public. Among their sales pitches was a representation made in person, through the mail and by way of newspaper advertisements to prospective investors and investors being asked to reinvest that the corporation could afford to pay high interest because it was an income tax deduction. The following is a quote from a standard newspaper advertisement:

"HOW . . .

"Alabama Acceptance Corp.

"Can Pay 7% Interest

"Interest is a cost of doing business. Our income taxes are 52%, and, therefore, Uncle Sam absorbs more than half of our interest cost. Our net interest costs, therefore, approximately 3.8%."

This representation was continuously made although Alabama Acceptance Corporation paid no federal income tax whatever because of no earnings during the entire period in question here. Its only association with income taxes was to receive refunds on account of losses.

Another pitch was through the medium of a pamphlet entitled "Alabama Acceptance Corporation—A Story of Interest," a brochure which was the basic literature of the company directed to prospective investors and which was prepared by an advertising man under the direct supervision of Greenhill and Proctor. "Financial Highlights" in this brochure were stated as of January 1, 1957 to be "working capital in excess of $800,000 and net worth in excess of $600,000". As of June 30, 1957, working capital was stated in this brochure to be $1,850,000, and net worth to be in excess of $760,000. Though not so stated the fair implication was that these figures reflected consolidated figures of Alabama Acceptance and all subsidiaries. No breakdown or detail on these totals was given.

Balance sheets furnished to the State Securities Commission of Alabama told a wholly different story. The figures as of January 1, 1957, rounded off in the style of Greenhill and Proctor, did show working capital, by including capital stock, surplus, the reserve for unearned discount, and the total of the subordinated debentures to be in excess of $800,000, but this included surplus based on a write up of fixed assets purchased under the acquisition program of over $464,000. The net worth was a little less than $600,000 but this also included the write up of fixed assets. The earned surplus had shrunk to a deficit of over $51,000. No investor could possibly know the true status of working capital or net worth from the brochure.

The balance sheet furnished the state for the quarter ending June 30, 1957, showed a startling discrepancy when compared with the figures represented in the brochure to be the "Financial Highlights" as of that date. Instead of working capital being in excess of $1,850,000 as represented, it was a little less than $800,000 including a figure of $166,271.-29 entitled "minority interest in subsidiaries", and net worth instead of being $760,000 as represented was a little less than $400,000. The write up of the surplus from fixed assets had decreased from $464,000 to $222,000 because sales of properties were inexorably setting the real value. Incidentally, these statements furnished to the State Commission were put in evidence by appellants.

As of September 30, 1957, Alabama Acceptance Corporation filed a statement with the State Securities Commission showing a balance sheet on Alabama Acceptance Corporation only with no subsidiaries included. This statement showed as assets all sums invested in actually acquiring subsidiaries and for options to purchase which expired. This statement showed a deficit in earned surplus of $345,494.92 making a deficit in net worth of $182,683.92. It will be recalled that the earned surplus of the company on February 29, 1956, a few

days before Murray acquired it and a few months before the start of the acquisition program, was $68.85 and the net worth of the company exclusive of subordinated debt was at that time $162,-879.85. The end was near but sales of debentures and notes to investors continued.

Greenhill in the meantime had become acquainted with the principals in Eastern Investment and Development Company and had acted as broker in their purchase of a controlling interest in Cornucopia Gold Mines, a company with approximately 4,000,000 shares of stock outstanding and listed on the American Stock Exchange. This purchase was of 1,000,000 shares at twenty five cents per share. The sales price during the latter part of 1957 ranged from a price of twenty five cents to thirty seven and one half cents per share. This company, according to a report filed with the Securities and Exchange Commission and in evidence had during the six months period ending June 30, 1957 an income of $1,774.07 and a net loss of $14,378.93. Its current assets consisted of $1,415 in cash and accounts receivable, and it had certain gold mining and uranium properties either acquired for cash or stock.

Greenhill worked out an arrangement with the principals of Eastern Investment whereby the four subsidiary properties of Alabama Acceptance Corporation remaining after previous sales would be sold to Cornucopia in exchange for two million shares of Cornucopia's stock to be issued which stock would be placed in a voting trust for ten years, with the two million shares to be divided in a manner to be later determined by and between Greenhill, Proctor, Frank Proctor & Associates and Alabama Acceptance Corporation. Greenhill advised in a letter to Accountant Williams who was seeking information for an audit that Alabama Acceptance would receive "upwards of 1,000,000 shares" and that Greenhill and Proctor would subordinate to debenture holders and creditors any Cornucopia stock to be received and owned by them. The record is silent as to how they would acquire their stock, the consideration for which was to be the subsidiaries of Alabama Acceptance Corporation. The agreement was subject to confirmation by the Cornucopia stockholders and the approval of the Securities and Exchange Commission, only a matter of form to Greenhill. The agreement was never confirmed nor approved and no stock was ever issued to Alabama Acceptance under the agreement.

In the meantime Cornucopia, with the consent of Alabama Acceptance and the holders of mortgages to secure the unpaid balances due on the subsidiaries took possession of the subsidiaries. Each subsidiary had been foreclosed by the original owners or was in receivership at the time of the trial, and both Cornucopia and Alabama Acceptance Corporation were in bankruptcy.

In addition to the debentures and unsecured notes being sold by Alabama Acceptance Corporation, notes were also being sold, secured by stock in one of the subsidiaries, or by automobile receivables. After the Cornucopia agreement, secured notes were sold on the representation that Cornucopia Gold Mine Stock was being held in trust to secure the loan represented by the note despite the fact that no Cornucopia stock whatever was ever received by Alabama Acceptance Corporation.

When the end came to this profitless and undercapitalized corporate structure, conceived as it was by appellants, the liabilities of Alabama Acceptance were over $1,000,000 while assets were less than $100,000. Between May, 1958 and the time of the trial, April 1960, the trustee had collected only $25,600.

■ This was the evidence before the court and jury. The jury might well have believed that appellants, with Greenhill dominating the operation but ably assisted by Proctor, set up a scheme, simple though it was, to channel monies into their pockets from Alabama Acceptance Corporation, and that the scheme was effectuated. This, coupled with the false

representations to investors in Alabama Acceptance Corporation, and the use of the mails would be an adequate basis for verdicts of conviction. At any rate the proof together with the allowable inferences was entirely sufficient and the court did not err in overruling the motions for judgment of acquittal. Hargrove v. United States, 5 Cir., 1944, 139 F.2d 1014 and Riggs v. United States, 5 Cir., 1960, 280 F.2d 949.

■ As to other errors assigned, we have carefully reviewed this record and conclude that appellants had their day in court. They were fairly tried. They were ably represented on the trial. All witnesses, facts, and records at the disposal of the government were presented or were available to appellants for their presentation. There is no reasonable basis for the claim that the prosecutor was too vigorous within the rule of Berger v. United States, 1935, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314. The government was as entitled to an advocate as appellants.

■ The fact that the government used, without objection based on prejudice, as five out of some twenty investor witnesses one who was blind, and others who were peculiarly objects of sympathy did not deprive appellants of due process of a fair trial. Appellants and not the government made them investors and prospective witnesses.

■ Appellants whose counsel on appeal did not participate in the trial of the case contend that due process under the Fifth Amendment was lacking because the evidence was so complex and incomplete that the jury could not understand it without either expert interpretation or the complete records. They urge the fact that the jury returned a verdict in approximately one hour as supporting the proposition that the verdict was based on either prejudice or the alleged erroneous testimony of Witness Williams, hereinafter discussed. We have set out the salient facts in some detail here to demonstrate that the evidence was not unusually complex nor was it incomplete. The ex-

hibits were explained to the jury during the progress of the trial. It would not have been unusual for the jury to reach a verdict in an hour on the record here. We reject the unsupported theory of appellants that a law offender, being entitled to a jury trial, should go free where there is danger from the complexity of facts of a jury being unable to understand the case, appellants contending that society and not the offender in such event should suffer.

■ Appellants testified and now strongly contend that they had no intent to defraud. Their testimony was, and others so testified, that the acquisitions made were to the benefit of Alabama Acceptance, and that they were only attempting to help a company that was operating at a loss. The law is that honest belief in the ultimate success of the venture will not justify false representations in the sale of securities. Danser v. United States, 1 Cir., 1960, 281 F.2d 492; Linn v. United States, 2 Cir., 1916, 234 F. 543; Proffer v. United States, 5 Cir., 1961, 288 F.2d 182; United States v. Crosby, 2 Cir., 1961, 294 F.2d 928; and Foshay v. United States, 8 Cir., 1933, 68 F.2d 205, cert. den., 291 U.S. 674, 54 S. Ct. 531, 78 L.Ed. 1063.

■ Appellants also assigned as error the failure of the court to grant a motion to transfer the case under Rule 21(a), F.R.Cr.P., 18 U.S.C.A., to the Southern District of New York because of undue prejudice resulting from wide spread publicity in the Birmingham area. The decision of the trial court on such a motion will be affirmed where as here no abuse of discretion is shown, and lack of abuse of discretion is buttressed where as here there was no showing in the course of the voir dire examination that any adverse publicity had effected the ability of the jurors to reach an unprejudiced decision. Kott v. United States, 5 Cir., 1947, 163 F.2d 984, cert. den., 333 U.S. 837, 68 S.Ct. 609, 92 L.Ed. 1122; Mayo v. Blackburn, 5 Cir., 1958, 250 F.2d 645, cert. den. 356 U.S. 938, 78 S.Ct. 780, 2 L.Ed.2d 813; and United States v.

412

Moran, 2 Cir., 1956, 236 F.2d 361, cert. den. 352 U.S. 909, 77 S.Ct. 148, 1 L.Ed.2d 118.

Appellants assert that the case of the government is based principally upon the testimony of Witness Williams, former auditor for Alabama Acceptance Corporation and that his testimony was contradicted by exhibits introduced by the government, but of course this is only a matter of weight and for the jury. They urge that the government's Exhibit 62 which was a compilation by Williams of the checks written by Alabama Acceptance to Proctor or to Greenhill or to Frank Proctor & Associates was unduly prejudicial in that it gave the jury the impression that large sums were improperly taken. They also urged on the trial and before this court that this exhibit was not admissible because it was a summary and only the original records would be admissible. The rule is that such a summary of books is admissible, provided cross-examination be allowed and the original records are available. Cooper v. United States, 5 Cir., 1937, 91 F.2d 195 and Kolbrenner v. United States, 5 Cir., 1926, 11 F.2d 754. The long and the short of these assertions is that the trial court postponed the trial to enable accounting witnesses for appellants to prepare their defense. All records were available to them. On the trial defense counsel objected to the exhibit in question because the checks were not available even though the original records, i. e., books of entry, were available. These checks were then presented to defense counsel on order of the court and some were used by the defense. Further, the testimony of Williams and the efficacy of this exhibit was substantially weakened if not destroyed by an accounting witness for appellants. There was no error in the admission of the exhibit and the weight of it and the testimony of Williams was for the jury.

Having had a fair trial, the verdict being adequately supported, and the errors assigned being without validity, the judgments are

Affirmed.