**UNITED STATES of America,**
Appellee,

v.

**Finley McAdoo PAINTER, Appellant.**
No. 8680.

United States Court of Appeals
Fourth Circuit.

Reargued Jan. 10, 1963.

Decided March 11, 1963.

---

Keith L. Newman, Huntington, W. Va., for appellant.

George D. Beter, Asst. U. S. Atty. (Harry G. Camper, Jr., U. S. Atty., on brief), for appellee.

Before SOBELOFF, Chief Judge, BRYAN, Circuit Judge, and LEWIS, District Judge.

SOBELOFF, Chief Judge.

After a trial extending over six days a jury in the United States District Court for the Southern District of West Virginia found Finley McAdoo Painter guilty on a five-count indictment charging use of the mails, and of radio and television in interstate commerce, with intent to defraud. 18 U.S.C.A. §§ 1341, 1343. The main contention made on this appeal is that the evidence was not sufficient to warrant the jury's finding that he had devised a scheme to defraud, and that therefore the District Court should have directed a judgment of acquittal in accordance with the defendant's motion. Our reading of the record compels us to hold that the conviction must stand.

A recital of the proof adduced by the Government necessarily begins with October 9, 1959, when Painter launched an extensive advertising campaign to encourage the general public to invest in a real estate project. Nine days later he organized and became sole owner of a company chartered as the Credit Discount Corporation. Prospective inves-

tors were told that Credit Discount owned a valuable 140-acre parcel of land known as the Peck Farm, situated adjacent to Huntington, West Virginia, and that this property was to be subdivided, developed, and improved by housing construction. It was represented that the company would pay eight to twelve per cent interest on all loans of $1000 or more "plus the return of entire principal in 12 months" and that such investments would be "fully secured by 12-month corporate notes." The advertisements further proclaimed that Credit Discount held "numerous properties over the city" and that it "had more than double the amount of assets to take care of these notes."

For more than a year Painter persisted in relaying to the public by mail, radio, television, and personal interview his promises of quick profits. That success of the promotional campaign depended upon interstate communications is undisputed.[1] The messages apparently bore fruit, for it is conceded that about a dozen persons relied thereon and invested a total of $24,000. And yet it is a striking fact that Credit Discount never took title to the Peck Farm or refunded, with but one exception,[2] any portion of the principal sum to the investors.

The record discloses that the Peck Farm was not acquired until December 14, 1959, when it was conveyed for the first time not to Credit Discount, but to State Motor Sales, Inc., another company also controlled by Painter as sole share-holder. On February 17, 1960, he and his wife incorporated a third entity and named it the Credit Realty Corporation. Shortly thereafter State Motor Sales transferred the Peck Farm to the new company. After holding this property for less than four months, Credit Realty reconveyed it to State Motor Sales on July 18. Later still, the Peck Farm was transferred back to Credit Realty, but not once did it pass to Credit Discount, which purportedly held the real estate as security for the "fully secured" corporate notes issued to investors. The debtor, Credit Discount, remained wholly without assets during the entire period, except for a brief interlude when it was in possession of two other properties of relatively inconsequential value.[3]

As the Peck Farm, the very keystone of the financial structure, shuttled back and forth between interlocking corporations at his personal whim, Painter continued to assure his investors that it was Credit Discount's primary asset. The confusion created by the deceptive similarity of the two corporate names, Credit Discount and Credit Realty, was compounded by joining both corporations in the same advertising. According to Philip R. Reeder, office manager for Credit Discount, this strategy was intended to cause the public to associate the corporations as one, rather than to distinguish between them as separate entities.[4]

Meanwhile, barren of assets and thus insulated from potential claims of its creditors, Credit Discount was being

1. Thus there is no problem here involving the role of the United States mails (or other means of interstate communication) in executing the scheme to defraud, as was the case in Kann v. United States, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944) ; Pereira v. United States, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1953) ; or Parr v. United States, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960).

2. Only Mrs. Gertrude L. Walcutt, who recovered half of her original investment of $2000, was spared total loss.

3. The evidence reveals that the two other properties which Painter claims were used to secure the Credit Discount notes con-sisted of a vacant theater building and an unimproved city lot, previously owned by State Motor Sales. Both were non-income producing properties and had been listed for sale by State Motor Sales prior to their conveyance to Credit Discount in February, 1960, and October, 1959, respectively. They were both reconveyed to State Motor Sales in July, 1960.

4. It may be noted parenthetically that one of Painter's own witnesses, C. F. Fuller, who had been engaged to survey the Peck Farm, could not accurately state which company paid for his services. He also testified that he thought both companies were one and the same.

steadily drained by Painter of its investment funds as they were received. This callous abuse of his position of trust was nowhere better portrayed than in Reeder's testimony. He swore that Painter instructed him to divert the Credit Discount money into the bank account of State Motor Sales, then in serious financial difficulty. He testified explicitly that Painter avowed to him that the purpose of these transfers was to make certain that these funds would be beyond the reach of the investors when their notes matured. Checks were drawn on Credit Discount's account to cover overdrafts of State Motor Sales to purchase a pair of airplanes, to make political contributions, and for other uses known only to Painter and unrelated to the purpose for which persons had been led to advance their money. Whether they were technically "investors" or, as they were sometimes called, "lenders," is immaterial. Additional witnesses substantially corroborated Reeder and certified copies of cancelled checks were introduced as government exhibits. While the Government was unable at trial to trace each and every defalcation,[5] there is significance in Painter's inability to offer to his investors any explanation of the ultimate disposition of their money when his financial empire finally collapsed in December, 1960. Judgment was entered against the now insolvent State Motor Sales in the sum of $71,000 on a lis pendens earlier filed by a creditor bank, thereby choking off what remained of the investment funds and freezing all assets, including the Peck Farm. Needless to say, Credit Discount was without funds to satisfy its investors' claims. The Peck Farm remained undeveloped.

In the circumstances here disclosed, we cannot escape the conclusion that there was "substantial evidence which, taken in the light most favorable to the United States, tends to show that the defendant is guilty beyond a reasonable doubt." Bell v. United States, 185 F.2d 302, 310 (4th Cir., 1950).[6] From a series of transactions the court preliminarily, and later the jury, could properly infer that Painter had devised a scheme for a major campaign of deceit through the mails, radio, and television to obtain funds on the strength of false assurances as to Credit Discount's financial strength, and then to divert the proceeds to his personal use. The deliberately false statements and subsequent conversion of funds by one who had assumed a fiduciary position constituted a patent fraud on the investors whom he had solicited.[7]

Painter argues that he did exactly as promised, making interest payments on the loans until the filing of lis pendens interrupted his plan to go through with the real estate project. The suggestion apparently is that the defendant actually believed that the enterprise would ultimately show a profit and that if he had been permitted to go

---

5. Conversion of money to the defendant's private use was not an essential element to be proved by the Government, United States v. Bagdasian, 291 F.2d 163, 164 (4th Cir., 1961), although evidence of such misappropriation is clearly relevant and admissible. United States v. Crosby, 294 F.2d 928, 947 (2d Cir., 1961).

6. See also United States v. Stradley, 295 F.2d 33, 35 (4th Cir., 1961) ; United States v. Freeman, 286 F.2d 262, 266 (4th Cir., 1961) ; United States v. Baren, 305 F.2d 527, 533 (2d Cir., 1962) ; Henderson v. United States, 202 F.2d 400, 403 (6th Cir., 1953).

7. Bradford v. United States, 129 F.2d 274, 276 (5th Cir., 1942) ; United States v.

Buckner, 108 F.2d 921, 926 (2d Cir., 1940) ; United States v. Hoffa, 205 F. Supp. 710, 716 (S.D.Fla.1962) ; cf. Aiken v. United States, 108 F.2d 182, 184 (4th Cir., 1939). Sending false financial statements through the mails (or in interstate commerce) in order to secure credit, knowing that such statements are false, constitutes a violation of the statutory provisions here involved. Dranow v. United States, 307 F.2d 545 (8th Cir., 1962) ; Danser v. United States, 281 F.2d 492 (5th Cir., 1960) ; Henderson v. United States, supra ; Bobbroff v. United States, 202 F.2d 389 (9th Cir., 1953) ; Slakoff v. United States, 8 F.2d 9 (3d Cir., 1925) ; United States v. Epstein, 152 F.Supp. 583 (E.D.Pa.1957).

on he would have performed his promises to repay the principal in full within twelve months. The clear answer is that no amount of honest belief that his corporate enterprise would eventually succeed can excuse the willful misrepresentations by which the investors' funds were obtained.[8] An investor may be defrauded if his reliance is induced by deliberately false statements of fact, and the defendant's optimism as to the future is no defense.[9] Moreover, the scheme to defraud may consist of suggestions and promises as to the future, not made in good faith but with deceptive intent.[10] The testimony here was such that either or both forms of fraud could be found.

■ While some of the investors did testify that they received regular interest payments, this does not necessarily establish the defendant's good faith, for in this setting it was consistent with an attempt to perpetuate the false appearance of things (in respect to the stability of the company and the "fully secured" notes), and to conceal the fraud already effected, and also to ensnare others. Only recently the Supreme Court had occasion to point out that communications having a propensity to lull and forestall action on the part of the victims may form an integral part of the overall scheme to defraud. United States v. Sampson, 371 U.S. 75, 80, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962).[11]

■ The final point raised by the appellant requires only brief exploration. He claims that he was guided in part by legal counsel. On this record we cannot accord finality to his answer that in pursuing the actions under inquiry he had obtained a legal opinion. In judging whether the defendant's behavior was honest or corrupt, this is a circumstance the jury was entitled to weigh and consider as part of the entire context of the case. If in good faith reliance upon legal advice given him by a lawyer to whom he has made full disclosure of the facts, one engages in a course of conduct later found to be illegal, the trier of fact may in appropriate circumstances conclude that the conduct was innocent because "the guilty mind" was absent. See United States v. Phillips, 217 F.2d 435, 441–443 (7th Cir., 1955); Miller v. United States, 277 F. 721, 726 (4th Cir., 1921). But consultation with lawyer confers no automatic immunity from the legal consequences of conscious fraud. United States v. Schaefer, 299 F.2d 625, 639 (7th Cir., 1962); Linden v. United States, 254 F.2d 560, 568 (4th Cir., 1958).

The crucial question here is the defendant's state of mind in issuing the interstate communications. The question being one for the jury and having been appropriately submitted, the conviction stands upon solid ground.

Affirmed.

8. Greenhill v. United States, 298 F.2d 405, 411 (5th Cir., 1962); United States v. Farago, 283 F.2d 772 (2d Cir., 1960); Frank v. United States, 220 F.2d 559, 564 (10th Cir., 1955); Deaver v. United States, 81 U.S.App.D.C. 148, 155 F.2d 740, 744 (1946); Hawley v. United States, 133 F.2d 966, 970 (10th Cir., 1943); Foshay v. United States, 68 F.2d 205, 210 (8th Cir., 1934); Pandolfo v. United States, 286 F. 8, 13 (7th Cir., 1923). See also Adams v. United States ex rel. McCann, 317 U.S. 269, 283, 63 S. Ct. 236, 87 L.Ed. 268 (1942) (dissenting opinion).

9. Getchell v. United States, 282 F.2d 681, 688 (5th Cir., 1961); Baker v. United States, 115 F.2d 533, 539 (8th Cir., 1940); Linn v. United States, 234 F. 543, 552 (7th Cir., 1917).

10. Durland v. United States, 161 U.S. 306, 313, 16 S.Ct. 508, 40 L.Ed. 709 (1896); United States v. Comyns, 248 U.S. 349, 353, 39 S.Ct. 98, 63 L.Ed. 287 (1919).

11. See also Cacy v. United States, 298 F. 2d 227, 230 (9th Cir., 1961); United States v. Fromen, 265 F.2d 702, 704 (2d Cir., 1959); Wiltsey v. United States, 222 F.2d 600, 602 (4th Cir., 1955); Clark v. United States, 93 U.S.App.D.C. 61, 208 F.2d 840, 841 (1953).