**UNITED STATES of America,**

v.

**PENNSYLVANIA INDUSTRIAL CHEMICAL CORPORATION, a Corporation, Appellant.**

**No. 71–1840.**

United States Court of Appeals,
Third Circuit.

Argued Jan. 18, 1972.

Decided May 30, 1972.

---

Harold Gondelman, Baskin, Boreman, Sacks, Gondelman & Craig, Pittsburgh, Pa., for appellant.

Richard L. Thornburgh, U. S. Atty., Pittsburgh, Pa., for appellee.

David McNeil Olds, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for amici curiae, U. S. Steel Corp. and Wheeling-Pittsburgh Steel Corp.

Judd N. Poffinberger, Jr., Kirkpatrick, Lockhart, Johnson & Hutchison, Pittsburgh, Pa., for amicus curiae, Jones and Laughlin Steel Corp.

Before ADAMS, and ROSEN, Circuit Judges and STAPLETON, District Judge.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

The issues in this appeal center on the parameters of the Rivers and Harbors Act of 1899 with regard to discharges from an industrial plant into the Monongahela River,[1] whether in the circumstances of this case a crime has been committed within the terms of the Act, and whether, if the Act applies, the conviction in this case comports with due process considerations.

In August, 1970, two teachers at the McKeesport Campus of the Pennsylvania State University canoed along the Monongahela River for the purpose of determining whether manufacturing operations on the river were discharging pollutants into it. They took samples on two different days—August 7 and 19

---

1. Section 13 of the Act, 33 U.S.C. § 407 provides:

"It shall not be lawful to throw, discharge, or deposit, or cause, suffer, or procure to be thrown, discharged, or deposited either from or out of any ship, barge, or other floating craft of any kind, or from the shore, wharf, manufacturing establishment, or mill of any kind, any refuse matter of any kind or description whatever other than that flowing from streets and sewers and passing therefrom in a liquid state, into any navigable water of the United States, or into any tributary of any navigable water from which the same shall float or be washed into such navigable water; and it shall not be lawful to deposit, or cause, suffer, or procure to be deposited material of any kind in any place on the bank of any navigable water, or on the bank of any tributary of any navigable water, where the same shall be liable to be washed into such navigable water, either by ordinary or high tides. or by storms or floods, or otherwise, whereby navigation shall or may be impeded or obstructed: *Provided,* That nothing herein contained shall extend to, apply to, or prohibit the operations in connection with the improvement of navigable waters or construction of public works, considered necessary and proper by the United States officers supervising such improvement or public work: *And provided further,* That the Secretary of the Army, whenever in the judgment of the Chief of Engineers anchorage and navigation will not be injured thereby, may permit the deposit of any material above mentioned in navigable waters, within limits to be defined and under conditions to be prescribed by him, provided application is made to him prior to depositing such material; and whenever any permit is so granted the conditions thereof shall be strictly complied with, and any violation thereof shall be unlawful."

—at two outfalls owned by the defendant, Pennsylvania Industrial Chemical Corp. (PICCO). These were sent to the Allegheny County Testing Laboratory for analysis. Based on the results, the United States Attorney filed a criminal information against PICCO [2] on April 6, 1971. Trial commenced before a jury on June 24, 1971, and the jury returned a verdict of guilty on June 29, 1971.

The points with which we deal in this appeal fall into three broad categories: (1) The general applicability of the statute; (2) Its applicability to the particular circumstances of this case; and (3) The due process grounds to be considered even if the statute would otherwise make PICCO's activities criminal.

## I. The Statute is Generally Applicable

Before evidence was presented, the district court preliminarily instructed the jury that the Government, in order to secure a conviction, was required to prove beyond a reasonable doubt that PICCO had discharged "refuse" matter from its plant, that the "refuse" was discharged into a "navigable water of the United States," and that the discharge was not "flowing from streets and sewers and passing therefrom in a liquid state," one of the exemptions set forth in the Act. The parties stipulated that PICCO owned the pipes through which the discharges entered the river, and that the Monongahela River is a "navigable water of the United States", thereby narrowing the issues for the jury.

PICCO first contends that the Act was intended to make criminal only the discharge of refuse which would impede navigation. Although the legislative history is equivocal on this point, we need look no further, however, than United ed States v. Esso Standard Oil Co. of Puerto Rico, 375 F.2d 621 (3d Cir. 1967), for this Court's holding that the Government need not prove that the discharge created an impediment to navigation in order to secure a conviction. There, petroleum products were spilled on the defendant's land, and, by force of gravity, flowed into navigable water. Both sides there agreed that the defendant was not guilty of violating the second clause of section 407, which forbids the impeding or obstruction of navigation. Yet this court affirmed the conviction based on the first clause, dealing with the discharge of "any refuse". Thus, the Act does apply to discharges of the type here in question, and gives no one the right to discharge "refuse matter of any kind" into "any navigable water of the United States." [3]

Next, PICCO contends that, even assuming arguendo that the industrial wastes discharged by it were "refuse", the portion of section 407 excepting refuse matter "flowing from streets and sewers and passing therefrom in a liquid state" from the coverage of the Act applies to the discharges here in issue as a matter of law. To support this position, PICCO relies on various texts and dictionary definitions written *circa* 1899, the year the Act became law, for the

2. Based on the data received from the teachers, informations were filed on the same day against United States Steel Corp., Jones & Laughlin Steel Corp., and Wheeling Pittsburgh Steel Corp. Although PICCO elected to go to trial immediately on its indictment, the other three defendants moved to dismiss the indictments against them in the district court. The motions are now in abeyance pending the outcome of this appeal, and the three were granted status as *amici* in this case.

3. Throughout the trial PICCO attempted to show that the matter flowing through its pipes into the river contained solids in solution, rather than suspension, thereby hoping to prove that its discharges would not "impede navigation". The district court sustained certain objections of the Government to these offers, and did not charge the jury that PICCO's discharges must have impeded navigation. In light of the decision in Standard Oil and the above discussion, this proof would not have constituted a defense. PICCO was not entitled to the charge, and, therefore, the trial court did not err in its rulings in this regard.

proposition that sewage was commonly defined to include industrial wastes. Congress, however, appears to have had a very different concern when it enacted the exception dealing with refuse matter "flowing from streets and sewers." As one legal scholar has noted:

> "[T]he sewage exception in the 1899 federal Refuse Act was designed to differentiate locally authorized from unauthorized discharges. By excepting refuse 'flowing from streets and sewers . . . in a liquid state,' Congress expressed awareness of the construction of public sewers, taking cognizance of the practice of the day of combining storm and sanitary sewers. The important point was not that waste made it through the system in a 'liquid state', but rather that local authorities had some control over who connected to a sewer system." Rodgers, Industrial Water Pollution and the Refuse Act: A Second Chance for Water Quality, 119 U.Pa.L.Rev. 761, 778 (1971) (footnote omitted); cf. United States v. Republic Steel Corp., 362 U.S. 482, 506 n. 27, 80 S.Ct. 884, 4 L.Ed.2d 903 (Harlan, J., dissenting).

In addition, the definition of sewage suggested by the Supreme Court does not materially differ from that employed by the district court, United States v. Republic Steel, supra, at 490, 80 S.Ct. 884. Moreover, to assert, as does PICCO, that any pipe carrying any wastes may be called a sewer, would erode the salutary command of Congress as stated in the Act in favor of a particular exception. As a matter of law, then, liquid industrial waste flowing through pipes into navigable water is not exempt from the proscriptions of the Act.

■ The final argument advanced by PICCO in this area of statutory interpretation is that unless section 407 is read in conjunction with the Water Pollution Control Act of 1948, 33 U.S.C. § 1151 et seq., its amendments of 1961 and 1965, and the Water and Environmental Quality Improvement Act of 1970, a conflict among the statutes is created. PICCO contends that, in order to resolve the conflict, the district court should have defined "refuse" to incorporate the water quality standards established pursuant to 33 U.S.C. § 1160(c) (1).

Under the Rivers and Harbors Act of 1899, the discharge of any refuse is made subject to a permit program while the newer statutes provide that discharges are proscribed only when they exceed the applicable water quality control standards. The federal standards set by the newer water quality statutes rely primarily on those of the states, with the proviso that in certain circumstances a federal standard may be applied. PICCO offered to prove at the trial that it had a permit from the Commonwealth of Pennsylvania to discharge its effluents into the Monongahela River, and that the discharges met the federal standards by complying with the criteria established by Pennsylvania.

PICCO reasons that if the Government prevails on this appeal, PICCO will be branded a criminal under one statute while it meticulously observes a companion provision aimed at the same goal. PICCO contends that we should resolve this apparent conflict by reading all the pollution acts in *pari materia* to reach an accommodation in the same fashion that the Supreme Court in Boys Markets, Inc. v. Retail Clerk's Union, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), reconciled the anti-injunction provision of the Norris-LaGuardia Act, 29 U.S.C. § 104, with the portion of the Labor Management Relations Act directing the federal courts to take jurisdiction in certain labor disputes, 29 U.S.C. § 185(a).

Such a course of action would be unjustified under the circumstances of this case on a number of grounds. It is crucial to note that beginning with the Water Pollution Control Act of 1948, Congress has on four separate occasions in the past 24 years specifically stated that section 407 of the Rivers and Harbors Act, banning "any refuse matter",

was not affected by the subsequent legislation.[4]

▮ Moreover, the Rivers and Harbors Act and the Water Pollution Control Act were designed to accomplish what may be viewed as the same end by different means. The Rivers and Harbors Act, by its terms, stipulates criminal penalties; the Water Pollution Control Act provides for civil actions only. The Rivers and Harbors Act may be enforced against those discharging refuse into any navigable water of the United States, while the Water Pollution Control Act may be used only if the pollution has an interstate effect. Finally, under the Rivers and Harbors Act there is no need for the 180-day notice period prior to the commencement of a civil proceeding as required by the Water Pollution Control Act. In view of these significant differences in approach, and the "cardinal rule that repeals [of legislation] by implication are not favored,"[5] the district court was correct when it declined to define "refuse" as used in the Rivers and Harbors Act in terms of the water quality standards established pursuant to section 1160–(c) (1) of the Water Pollution Control Act.

### II. The Circumstances Here Demonstrate That No Crime Was Committed

Although we have held above that it would be improper to accommodate the 1899 Act with recent water pollution legislation by redefining the word "refuse" in the 1899 Act, the provision of a permit program in the 1899 Act is important if some sense is to be made of these statutes.

▮ It should first be pointed out that neither United States v. Standard Oil Co., 384 U.S. 224, 86 S.Ct. 1427, 16 L.Ed.2d 492 (1966); United States v. Republic Steel Corp., *supra*, nor United

States v. Esso Standard Oil Co. of Puerto Rico, *supra*, dealt with the existence or non-existence of a permit program under the 1899 Act. In *Republic Steel*, it was clear that the discharges impeded navigation and that no permit was sought or held by the company, while in both *Standard Oil* cases the existence of a permit program was irrelevant because of the accidental nature of the discharges involved. For present purposes, the significance of these cases is that the courts there found a congressional intent that all discharges of refuse of any kind, including discharges of refuse which do not adversely affect navigation, should be subject to regulation. They did not, however, find that Congress intended to prohibit all such discharges.

The conclusion that section 407 of the Rivers and Harbors Act was intended to establish a regulatory program rather than a general prohibition is indicated not only by practical considerations relating to the drastic impact that a general prohibition against discharging any "foreign substance" would have had on the nation's economy even in 1899, but also by Congress' subsequent enactments in the water quality field. There would appear to be something fundamentally inconsistent between the program of developing and enforcing water quality standards under the Water Quality Act and section 407 of the Rivers and Harbors Act, if the effect of the latter is to prohibit all discharges of industrial waste into navigable waters. Congress, however, obviously thought that the two statutes were compatible or it would not have expressly disavowed any intention to repeal or affect section 407 when it enacted the Water Quality Act of 1965. What makes the two statutes compatible is the permit program contemplated by Section 13. The Government recognizes this fact when it describes the purpose

4. 33 U.S.C. § 1174.

5. Lynch v. Household Finance Corp., 406 U.S. 911, 92 S.Ct. 1611, 31 L.Ed.2d 822 (1972) *citing* Posadas v. National City Bank, 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936).

of the 1965 and 1970 water quality acts as follows:

"Congress sought to establish minimum standards under the new laws; the older law was retained, however (33 U.S.C. § 1174), as a foundation. It announces the federal policy that *no* person or corporation has a *right* to discharge into any navigable stream unless permitted to do so. The new law proceeds to state that such permission may not be granted to one whose discharge would violate the standards to be established." [6]

The situation in August of 1970, when the discharges here in issue were made, must be evaluated with this in mind. In short, following the *Standard Oil* case it was clear that discharges of refuse not tending adversely to affect navigation were within the scope of section 407. It was also clear, at least by the time of the enactment of the Water Quality Act of 1965, that Congress intended the Secretary of the Army and the Corps of Engineers to administer section 407 not as a vehicle for protecting navigable waters from all discharges of industrial refuse, but rather as a vehicle for furthering the national conservation policy.

PICCO offered to prove in the court below that the executive branch of the Government simply failed to respond to this congressional directive insofar as it related to discharges having no significance for navigation until December of 1970, when the institution of a permit program under section 407 was announced by the President. There would appear to be substantial support for this contention. From 1965 until December of 1968, the only regulation pertaining to section 407 of the Rivers and Harbors Act provided as follows:

"§ 209.395. *Deposit of refuse.* Section 13 of the River and Harbor Act of March 3, 1899 (30 Stat. 1152; 33 U.S.C. 407), prohibits the deposit in navigable waters generally of 'refuse matter of any kind or description whatever other than that flowing from streets and sewers and passing therefrom in a liquid state'. The jurisdiction of the Department of the Army, derived from the Federal laws enacted for the protection and preservation of the navigable waters of the United States, is limited and directed to such control as may be necessary to protect the public right of navigation. Action under section 13 has therefore been directed by the Department principally against the discharge of those materials that are obstructive or injurious to navigation." 33 C.F.R. § 209.-395 (1967)

PICCO tendered in evidence a publication of the Corps of Engineers dated March 18, 1968. This publication contains the following statements, among others:

"1. Sections 10 and 13 of the River and Harbor Act . . . is (sic) designed to protect navigation and the navigable capacity of Federal navigable waters and places responsibility for enforcement upon the Department of the Army.

2. The instructions and program that follow in this paragraph deal with the problem of illegal deposits in navigable waterways under the law which explicitly concerns navigation. The Corps of Engineers has a responsibility for pollution abatement and is carrying out that responsibility under various other media.

3. The concern of the Department of the Army in industrial waste under this program lies in the effect the suspended solids contained in the effluent from industrial outfalls have on navigable capacity of the waterway. The Department is primarily con-

---

6. While Congress did not until the Water Quality Improvement Act of 1970 add to its water quality control legislation an express prohibition against the granting of a § 407 permit for discharges not meeting the water quality standards, this action was an explicit recognition of what Congress must have assumed when it enacted the Water Quality Act of 1965— that applications for permits under § 407 would be acted upon with an eye to the water quality acts.

cerned under this program with the shoaling of authorized improved navigation channels and in placing the responsibility and/or cost for moving these shoals on those industries that are causing them."

In December of 1968 the Corps of Engineers of the Department of the Army published a complete revision of Part 209 of the Code of Federal Regulations. While the revision served notice that the Corps of Engineers would consider pollution and other conservation factors in passing on applications under sections 9 and 10 of the Rivers and Harbors Act for permits for "work in navigable waters" (33 C.F.R. § 209.120(d), the sole reference to section 407 again described it in terms limited to problems of navigation:

"(2) Section 13 of the River and Harbor Act of March 3, 1899 (30 Stat. 1152; 33 U.S.C. 407) authorizes the Secretary of the Army to permit the deposit of refuse matter in navigable waters, whenever in the judgment of the Chief of Engineers anchorage and navigation will not be injured thereby, within limits to be defined and under conditions to be prescribed by him. Although the Department has exercised this authority from time to time, it is considered preferable to act under Section 4 of the River and Harbor Act of March 3, 1905 (33 Stat. 1147; 33 U.S.C. 419). As a means of assisting the Chief of Engineers in determining the effect on anchorage of vessels, the views of the U.S. Coast Guard will be solicited by coordination with the Commander of the local Coast Guard District." 33 C.F.R. § 209.-200(e) (2).[7]

This version of Part 209 remained in effect in August of 1970.

The materials which PICCO submitted to the district court appear to indicate that the agency responsible for administering the regulatory program under Section 13 made no determination that its congressional commission required it to deny permits on a blanket basis to all seeking to discharge industrial refuse having no adverse effect on navigation. Nor would the absence of a permit program in this area appear to be the product of a temporary administrative moratorium pending development of appropriate policies and procedures. Rather it would appear that the Corps of Engineers, perhaps as a result of a mistake of law, made a conscious decision to decline to undertake the responsibility imposed upon it by Congress.

■ There is a certain appeal to the crisp conclusion of the district court that Congress intended criminal penalties for one who discharged without a permit and that PICCO concededly had no permit. When viewed in the context of this case and tested with the touchstone of congressional intent, however, this analysis produces an unsound result. Congress contemplated a regulatory program pursuant to which persons in PICCO's position would be able to discharge industrial refuse at the discretion of the Secretary of the Army. It intended criminal penalties for those who failed to comply with this regulatory program. Congress did not, however, intend criminal penalties for people who failed to comply with a non-existent regulatory program.[8] The members of Congress

---

7. The Corps' § 4 jurisdiction was described in the preceding paragraph as follows:

"(1) Section 4 of the River and Harbor Act of March 3, 1905 (33 Stat. 1147; 33 U.S.C. 419), authorizes the Secretary of the Army to prescribe regulations to govern the transportation and dumping into any navigable water, or waters adjacent thereto, of dredgings and other refuse materials *whenever in his judgment such regulations are required in the interest of navigation.*"

(Emphasis supplied) 33 C.F.R. § 209.-200(e) (1).

8. Research has revealed only one case where the prosecuting authorities have pressed criminal charges under comparable circumstances. The conviction was overturned. Brown v. State, 74 Tex.Cr. R. 108, 167 S.W. 348 (Ct.App.1914). See also Mitchell v. Dixon, 140 Tex. 520, 168 S.W.2d 654 (Texas Com.App.1943).

who enacted the Water Quality Acts of 1965 and 1970 with their "saving provisions" for section 407 of the Rivers and Harbors Act might well be astonished by the broad implications inherent in the judgment of conviction entered below.

Similarly unsound is the Government's contention that the absence of a permit program is irrelevant because PICCO never applied for a permit. If PICCO proves what it has offered to prove and if, as we have concluded, Congress did not intend to make failure to comply with a nonexistent program a crime, we do not believe that the axe can stay or fall depending upon whether the defendant did or did not go through the charade of making an application for something which did not exist.

Out of an abundance of caution, we hasten to add that what we have said would have no relevance whatever to any discharge occurring after the implementation of the permit program.[9] Compliance with the water quality standards should not, of course, be a defense to an action brought under section 407 against one who has discharged without a permit. Congress intended that the executive branch of the Government have advance notice of proposed discharges and an opportunity to determine whether such discharges will be consistent with national policy. Accordingly, one who discharges without a permit undermines the program regardless of the character of the discharge. There is a vast difference, however, between a conviction of one who fails to secure an available permit and a conviction of one who fails to secure a permit which is unavailable.[9a]

If this case falls in the latter category, we hold that PICCO has been convicted of a crime which Congress has never created.

III. Even If The Act of 1899 Were Construed To Make PICCO's Activities Criminal, Due Process Considerations Would Require A Reversal

Because of the importance of this case in the ecology field, we are constrained to set forth an alternative basis for our order directing a reversal of the conviction and a remand.[10] The proposition is advanced that when we take together the vagueness of the Act, its history, the administrative interpretation of the Act by the Corps of Engineers, and other actions of the Government, it would be unreasonable to expect an individual or a corporation to conclude that the Act would apply to industrial discharges not affecting navigation.

One of the important aspects of PICCO's contentions relates to the portion of section 407 that authorizes "The Secretary of the Army, whenever in the judgment of the Chief of Engineers anchorage and navigation will not be injured thereby, [to] permit the deposit of any material above mentioned in navigable waters * * *" The Government agrees that possession of a permit issued by the Secretary would constitute a complete defense to the prosecution. The uncontradicted testimony of Mr. William Johnston, a Vice-president of PICCO, showed that at least since 1944 no permit program had been established by the Corps of Engineers for discharges into the Monongahela River. In fact, it was not until December 23, 1970, more

9. We do not intend to convey the impression that by reversing the conviction here we are indifferent to the need for environmental improvement. However, because federal water quality standards may be enforced vigorously as soon as a permit program is implemented, our decision today should have very little effect on the ecological well-being of our nation in the future, and, in fact, this case will have only small implications for the past.

9a. See, Sanders, The Refuse Act of 1899; Key to Clean Water, 58 A.B.A.J. 468, 469 (1972).

10. We are quick to point out that because of the nature of our alternative basis for decision, certain of the rationales advanced here may appear to be inconsistent with those set forth in Part II, supra.

than four months after the commission of the act alleged in the indictment, that by Executive Order 11574, 35 Fed.Reg. 19627, the President announced the institution of a permit program under section 407 to achieve compliance with federal water quality standards. Mr. Johnston also testified that in 1949 he had spoken with an individual in the Corps of Engineers office in Pittsburgh and that as a result of that conversation, PICCO never applied for a permit to discharge refuse into the river. PICCO thus takes exception to that portion of the district court's charge which stated, "But it is not the contention of the Defendant that the act was done unknowingly or unintentionally." PICCO objects on the basis that it was acting in a manner consistent with what it thought the law required, and that Mr. Johnston had been told by a member of the Corps of Engineers that the statute did not require a permit for the discharge of industrial wastes not affecting navigation.

▆▆▆ The test to determine whether these facts, if true, would be sufficient to make out a due process violation is set forth in the leading case of Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926):

> "That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it that conduct on their part will render them liable to its penalties, is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law: and a statute which

either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law."

▆▆▆ In the situation presented here, however, PICCO claims it was misled by interpretation given to the statute by the Corps of Engineers, the body primarily responsible for the navigable waters of the United States.[11] Cf. United States v. Painter, 314 F.2d 939 (4th Cir.), cert. denied, 374 U.S. 831, 83 S.Ct. 1873, 10 L.Ed.2d 1054 (1963); United States v. Mancuso, 139 F.2d 90 (3d Cir. 1944). There is evidence that prior to December, 1970, the Corps of Engineers, in its published regulations, had consistently interpreted section 407 to require a permit for industrial discharges only when the effect of the discharges would be to impede navigation, e. g., a deposit of solids on the river bed tending to lower the water level of a navigable channel. The only reference to section 407 in the Corps' regulations governing the issuance of the various permits under the 1899 Act is found at 33 C.F.R. § 209.200(e), reproduced *supra* at 14. Moreover, in an internal regulation published in March, 1968, reproduced *supra* at 14, the Corps noted its concern for navigation only. Because this Court must give great weight to the consistent interpretation of a statute by the agency primarily responsible for its enforcement, Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), PICCO also should be permitted to rely on the Corps' reading of section 407.

---

11. Adding to the claimed confusion is the Water Quality Act of 1965, according to which if PICCO obeyed state standards and obtained a state permit, its discharges would not be subject to abatement. Although we held above that PICCO's belief was erroneous that it was not in violation of § 407 because of its alleged compliance with the 1965 Act, PICCO's belief appears not to have been unreasonable or held in bad faith. Moreover, PICCO asserts that to accept the Government's view of the Act, might well create a confiscatory im-

pact. If it is true that no discharge permits have been available from the Corps of Engineers, every industrial concern along the Monongahela, and perhaps throughout a substantial portion of the nation, which uses water from navigable waters in the operation of its plant and puts back something other than pure water would be in violation of the Act. Indeed, for practical purposes, many of these plants might not be able to operate at all.

It is the position of the Government,[12] on the other hand, that the statute does not require a showing of scienter—criminal intent—and the mere lack of a permit program should not constitute a defense to a criminal charge under section 407.

In its two major decisions concerning the 1899 Act the Supreme Court has not given any indication whether scienter may be a necessary element of the offense under section 407. United States v. Standard Oil Co., 384 U.S. 224, 86 S.Ct. 1427, 16 L.Ed.2d 492 (1966); United States v. Republic Steel Corp., 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960). In fact, in the *Standard Oil* case, the Court specifically left open the scienter question. 384 U.S. at 230, 86 S.Ct. 1427. The Government conceives PICCO's argument as encompassing nothing more than the traditionally rejected defense that ignorance of the law is an excuse.

PICCO does not claim that it did not know the law existed. Its proofs showed that it was well aware of section 407. Rather, PICCO asserts that it was affirmatively misled by the Corps of Engineers to believe that the Act would be inapplicable to discharges of waste that did not impede navigation.

Thus the assertion is not that PICCO was ignorant of the law's application to it and therefore lacked scienter. Instead, it is contended that had it not been for misleading behavior—whether intentional or not—of the Corps of Engineers, PICCO would have been able to decide if it should apply for a permit from the Corps, and depending on the Corps' response to an application, PICCO could have planned its behavior accordingly.

It might be maintained that, if nothing else, the Supreme Court's decisions in *Republic Steel* and *Standard Oil*

should have given PICCO notice that it was in violation of the 1899 Act. In *Republic Steel*, it is clear that the industrial discharges impeded navigation contrary to the command of the second clause of section 407. PICCO has claimed throughout the litigation, and the claim is uncontradicted, that its discharges have no navigational effect. *Standard Oil,* on the other hand, dealt with the accidental discharge of aviation fuel, and the Court decided only that commercially valuable substances could be "refuse" for purposes of section 407. Similarly, our decision in United States v. Standard Oil of Puerto Rico, *supra,* is insufficient to have made PICCO aware of its alleged continuing violation of the Act. The issue there was whether the defendant could be responsible for gasoline deposited into navigable waters not directly and intentionally, but which had spilled on defendant's land and by force of gravity flowed into the water. That the 1899 Act has been employed to prosecute one-time accidental deposits of refuse has been clear for some time. *See, e. g.,* La Merced, 84 F.2d 444 (9th Cir. 1936). No decision has been brought to our attention, however, holding criminally responsible an industrial firm whose discharges were not one-time accidents or whose day-to-day discharges had no navigational effect.

In much the same way, the Government's contention that lack of a permit program will not constitute a defense misses the point here. We are presented with much more than the mere absence of a permit program. To begin, it was not unreasonable for PICCO to read section 407 as permitting the discharge of wastes not affecting navigation. The Corps of Engineers, in published regulations, appeared to read the Act in the same way. Until 1970, the Department of Justice concurred in this interpretation of the Act. According to an Assist-

---

12. Although the Government points to a Corps pamphlet published in 1968 to show its concern with pollution, we do not find the passage to convey clearly the meaning ascribed, and we have grave doubts that PICCO can be held to have knowledge of such materials. *See* Hotch v. United States, 212 F.2d 280, 14 Alaska 594 (9th Cir. 1954).

ant Attorney General, "Only until early last year, this statute was administered in the Department of Justice strictly as a criminal statute and it was usually applied to discharges into the navigable waters of the United States which impeded navigation." Proceedings, Refuse Act of 1899, 30 Fed.B.J. 327, 328 (1971). When we add to this the proffered testimony of Mr. Johnston that a member of the Corps of Engineers told him no permit would be necessary if the discharges would not impede navigation, it is clear that PICCO does not rely on the mere lack of a permit program. It relies, rather, on the alleged fact that it was affirmatively misled into not applying for a permit.[13]

In such circumstances, the apparent position of the Government may well have been unfair to the point that PICCO's conviction violated due process.[14] The concept of fair play is implicit in our basic notions of what is meant by due process of law. In this regard, an individual or corporation should not be held criminally responsible for activities which could not reasonably have been anticipated to be illegal based on 70 years of consistent government interpretation and subsequent behavior. *Cf.*, Bouie v. City of Columbia, 378 U.S. 347, 351, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964); United States v. Harriss, 347 U.S. 612, 617, 74 S.Ct. 803, 98 L.Ed. 989 (1954). We hold, in the alternative, therefore, because evidence which would have been relevant to PICCO's defense was incorrectly excluded by the district court and because the jury was not instructed regarding such defense, that PICCO is entitled to a new trial.[15]

### IV. Proceedings On Remand

Based on our holding in Part II, *supra*, PICCO should be given the opportunity to prove the non-existence of a permit program at the time of the alleged of-

13. In this regard it is interesting to note that if the Federal Criminal Code proposed by the National Commission on Reform of Federal Criminal Laws were the law, PICCO would appear to have a defense under § 609 which reads:
    "Except as otherwise expressly provided, a person's good faith belief that conduct does not constitute a crime is an affirmative defense if he acted in reasonable reliance upon a statement of the law contained in:
    (a) a statute or other enactment;
    (b) a judicial decision, opinion, order or judgment;
    (c) an administrative order or grant of permission; or
    (d) an official interpretation of the public servant or body charged by law with responsibility for the interpretation, administration or enforcement of the law defining the crime."
    As explained in Working Papers, National Commission on Reform of Federal Criminal Laws 138 (1970),
    "If a defense of reasonable reliance on a competent (official or unofficial) statement of the law is omitted, prosecutors can be counted on to decline prosecutions where the defense would be plainly and fully applicable. There are, indeed, remarkably few reported cases in which the defense has been at issue. Judges will not be likely to impose severe sentences in the cases brought by a too zealous prosecutor. Nevertheless, a person who would not have violated the law if his reasonable understanding of the law, gained by his own efforts to obtain legal advice or from reliable official statements, had not been mistaken should not find himself in the position of having to depend on the prosecutor's or trial judge's decision not to prosecute for a crime which, in law, he committed."
    In this case, the prosecutor did elect to proceed and PICCO was given the maximum fine.

14. It should also be pointed out that even the Attorney General of the United States, when considering the purpose of a direct predecessor of the 1899 Act, stated:
    "You should be governed only by considerations affecting the navigation of the river and, if there be none now, then by considerations which may affect future navigation, whether it is likely to become important or not, which Congress must be presumed to have had in mind in authorizing the present and large expenditures which have been made in the improvement of the river." 21 Op.Atty.Gen. 305, 308 (1896).

15. The holdings of parts II and III of this opinion are limited to the record with which we have been presented.

fenses. Should the evidence show that, in fact, a permit program did exist at the relevant time, then, based on Part III, *supra,* PICCO should be allowed to attempt to prove that the Corps of Engineers affirmatively misled it into believing that a permit was not necessary in its situation.

Accordingly, the judgment of conviction will be reversed and the cause remanded to the district court for proceedings consistent with this opinion.

STAPLETON, District Judge (concurring).

I concur in the views expressed in the first two sections of the majority's opinion. I am unable, however, to subscribe to the views stated in the third section of that opinion.

In United States v. Standard Oil Co., 384 U.S. 224, 230, 86 S.Ct. 1427, 1430, 16 L.Ed.2d 492 (1966) the Supreme Court of the United States concluded that "the word 'refuse' [as used in Section 13 of the Rivers and Harbors Act] includes all foreign substances and pollutants and sewers and passing therefrom in a apart from those 'flowing from streets liquid state' into the watercourse." In United States v. Esso Standard Oil Co. of Puerto Rico, 375 F.2d 621 (3rd Cir. 1967), this Court followed suit by upholding a conviction under Section 13 in a case where there was no evidence that the discharge might adversely affect navigation. I find it difficult to assign to these pronouncements the limited significance given them in the third section of the majority's opinion.

As I read this portion of the majority's opinion, it holds that despite the pronouncements of the courts in these cases, PICCO may successfully assert a defense that it was affirmatively misled by the regulations of the Corps of Engineers into believing that Section 13 did not apply to discharges which would not adversely affect navigation. While I agree that the Due Process Clause may require a court to recognize the defense

suggested by Section 609 of the proposed Federal Criminal Code and may encompass a theory of estoppel even in criminal cases,[1] I do not believe that a citizen may reasonably rely on a statement in an administrative regulation when the judicial branch of the government has clearly declared the contrary.

---

1. See Note, Applying Estoppel Principles in Criminal Cases, 78 Yale L.J. 1046 (1969).
nation.