**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**UNITED STATES STEEL CORPORA-**
**TION, Defendant-Appellant.**

**No. 72-1590.**

United States Court of Appeals,
Seventh Circuit.

Heard Feb. 16, 1973.

Decided May 11, 1973.

Rehearing Denied June 8, 1973.

Certiorari Denied Oct. 15, 1973.
See 94 S.Ct. 229.

See also D.C., 328 F.Supp. 354.

Jay A. Lipe, Chicago, Ill., for defendant-appellant.

John F. Flynn, Asst. U. S. Atty., Hammond, Ind., William C. Lee, U. S. Atty., Ft. Wayne, Ind., for plaintiff-appellee.

Before SWYGERT, Chief Judge, and CUMMINGS and STEVENS, Circuit Judges.

CUMMINGS, Circuit Judge.

This criminal prosecution was based upon a 2-count information alleging violations of Sections 13 and 16 of the Rivers and Harbors Act of 1899 (33 U.S.C. §§ 407 and 411). Count I alleged that defendant discharged refuse matter from a drainpipe into the east branch of the Grand Calumet River on October 11, 1967. Count II alleged that the defendant deposited refuse matter from another drainpipe into the same river on the same date. The refuse matter described in Count I consisted of a "red-brown particulate sediment" and in Count II, of an "oily substance." After a jury verdict of guilty, the district court assessed the maximum fine of $2,500 on each count, and defendant has appealed from the judgment imposing those fines. The district court's memorandum opinion is reported at 328 F.Supp. 354 (N. D.Ind.1970).

In this Court defendant admits the discharges in question. In support of reversal it urges the non-applicability of the 1899 Act to the discharges because they did not affect the navigability of the receiving stream and because they occurred after enactment of The Water Quality Act of 1965, the contrariety of its conviction to Congressional intent and to due process in the absence of a regulatory permit program, and the erroneousness of certain of the trial court's evidentiary rulings. We affirm.

*Applicability of Section 13 to Non-Navigation-Threatening Refuse Discharges*

Defendant's principal argument is that Section 13 of the Rivers and Harbors Act of 1899 does not cover these discharges of effluent waste into the Grand Calumet River on the ground that the statute requires an effect on navigation. At the trial, the Government made no attempt to prove that these discharges impeded or obstructed navigation or had a tendency to do so. It contended, as it contends here, that the first clause of Section 13 applies to the present discharges regardless of an effect on navigation.

The statute in question has lately become known as the Refuse Act of 1899. Section 13 thereof provides:

"It shall not be lawful to throw, discharge, or deposit, or cause, suffer, or procure to be thrown, discharged, or deposited either from or out of any ship, barge, or other floating craft of any kind, or from the shore, wharf, manufacturing establishment, or mill of any kind, any refuse matter of any kind or description whatever other than that flowing from streets and sewers and passing therefrom in a liquid state, into any navigable water of the United States, or into any tributary of any navigable water from which the same shall float or be washed into such navigable water; and it shall not be lawful to deposit, or cause, suffer or procure to be deposited material of any kind in any place on the bank of any navigable water, or on the bank of any tributary of any navigable water, where the same shall be liable to be washed into such navigable water either by ordinary or high tides, or by storms or floods, or otherwise, whereby navigation shall or may be impeded or obstructed: *Provided,* That nothing herein contained shall extend to, apply to, or prohibit the operations in connection with the improvement of navigable waters or construction of public works, considered necessary and proper by the United States officers supervising such improvement or public work: *And provide further,* That the Secretary of the Army, whenever in the judgment of the Chief of Engineers anchorage and navigation will not be injured thereby, may permit the deposit of any material above mentioned in navigable waters, within limits to be defined and under conditions to be prescribed by him, provided application is made to him prior to depositing such material; and whenever any permit is ·so granted the conditions thereof shall be strictly complied with, and any violation thereof shall be unlawful." (33 U.S. C. § 407)[1]

The first offense created by this statute, the offense for which defendant was prosecuted, consists in discharging into navigable waters "any refuse matter of any kind or description whatever." The sole exception to the refuse matter coverage is for municipal sewage.[2] The

1. For violations of Section 13, Section 16 of this statute imposes fines from $500 to $2500 or imprisonment for 30 days to a year or both. (33 U.S.C. § 411)

2. See United States v. Republic Steel Corp., 362 U.S. 482, 490, 80 S.Ct. 884, 4 L.Ed.2d 903.
 This exception had its genesis in an 1888 Act relating to discharges into New York Harbor (25 Stat. 209, as amended, 33 U.S.C. § 441). It is found in Section 6 of the Rivers and Harbors Act of 1894 (28 Stat. 363), which is drawn from the 1888 Act, and was carried through to Section 13 of the Rivers and Harbors Act of 1899. The district court observed it would be anomalous to have an exception for refuse matter "flowing from streets and sewers and passing therefrom in a liquid state" if the statute was aimed solely at materials which obstructed navigation because the excepted matter had no apparent tendency to obstruct navigation in the first place. 328 F.Supp. at 357. Of course, sewage "may contain some articles in suspension that settle out and potentially impair navigability." United States v. Republic Steel Corp., *supra* 362 U.S. at 491, 80 S.Ct. at 889, but permanent shoaling only occurs "in a few instances" and generally the suspended

second portion of the statute addresses the depositing of "material of any kind in any place on the bank of any navigable water * * * where the same shall be liable to be washed into such navigable water * * *." Such depositing, however, is an offense only if thereby "navigation shall or may be impeded or obstructed." Although defendant contends Congress intended that this navigational effect limitation also apply to the refuse discharge prohibition of the first portion of the statute, we do not understand it to contend that the adverbial phrase embodying that limitation can properly be read to modify the definition of the first offense. Grammatically it cannot.

Section 13 contains two provisos, only the second of which is pertinent here. That proviso allows "the deposit of any material above mentioned in navigable waters" if upon prior application to him the Secretary of the Army grants a permit therefor. The criterion for granting the permit is the Chief of Engineers' judgment that "anchorage and navigation will not be injured" by the deposit. The final proviso makes sense only if it is interpreted to apply to both the first and the second offenses enunciated by the statute. There seems to be no question but that it applies to the second portion. Since the first clause is the one referring explicitly to a "deposit * * * into any navigable water," the proviso fits it most comfortably. If it did not apply to the first clause, no discharge of any refuse matter could ever avoid criminality.

■ On its face, therefore, the first part of Section 13 proscribes the discharge of "any refuse matter of any kind or description whatever" into navigable waters without a permit. The words of the statute do not impose any limitation of an effect on navigation or

tendency to affect navigation on the refuse matter covered. Defendant's argument for reading in this qualification relies on legislative history as indicative of a Congressional concern only with discharges "which tend to impair navigability." We think the statute is plain on its face, but since words are necessarily inexact and ambiguity is a relative concept, we now turn to the legislative history, mindful that the plainer the language, the more convincing contrary legislative history must be.

Although statutes dealing with discharges in the navigable waters of New York Harbor were enacted in 1886[3] and 1888,[4] the first statute of general applicability was enacted in 1890. Section 6 of this statute made it unlawful to empty either from a vessel or from shore "any ballast, stone, slate, gravel, earth, rubbish, wreck, filth, slabs, edgings, sawdust, slag, cinders, ashes, refuse, or other waste of any kind, into any port, road, roadstead, harbor, haven, navigable river or navigable waters of the United States *which shall tend to impede or obstruct navigation* * * *" (emphasis supplied). It also prohibited the deposit of such materials on the bank of any navigable waters where it was liable to be washed into the waters and "whereby *navigation shall or may be impeded or obstructed*." A proviso excepted deposits under a permit from the Secretary of War designating a place where the deposit would not obstruct navigation. 26 Stat. 453.

In 1894 Congress again legislated on the subject of discharges into navigable waters. Section 6 of the Rivers and Harbors Act of that year made it unlawful to discharge "by any process or in any manner, ballast, refuse, dirt, ashes, cinders, mud, sand, dredgings, sludge, acid, or any other matter of any kind other than that flowing from streets,

---

organic matter will decompose and pose no problem. *Id.* at n. 6. The exception addresses matter which typically will not affect navigability, but, on the other hand, does not exempt from a class of possibly obstructing material only that which could

not impair navigation since it excepts all "liquid" sewage discharges.

3. 24 Stat. 329.

4. 25 Stat. 209, as amended, 33 U.S.C. § 441.

sewers, and passing therefrom in a liquid state in the waters of any harbor or river of the United States &ast; &ast; &ast; elsewhere than in the limits defined and permitted by the Secretary of War." 28 Stat. 363. The striking difference between the 1890 and 1894 Acts is the absence of any navigation-threatening qualification in the latter. Moreover, Section 6 of the 1894 Act has a shortened list of enumerated substances and introduced the exception for municipal sewage.

Defendant argues that the absence of any explicit qualification in the 1894 Act relating to navigational impairment does not mean that Congress intended to abandon that qualification. It seems true, as defendant suggests, that the 1894 Act was precipitated by the Corps of Engineers' complaint that the 1890 Act was difficult to enforce because it contained no provision for an *in rem* proceeding against a vessel or for liability of the master or engineer; the 1890 Act applied only to persons or corporations owning the vessel.[5] In response, Congress drew on Sections 2 and 4 of the 1888 New York Harbor Act in enacting Sections 7 and 8 of the 1894 Act to supply the lacking features. However, it also borrowed from the New York Harbor Act to enact the substantive provision of the 1894 Act, Section 6, quoted in part above. It has been suggested that this was "redundant" because the Corps only sought additional liability provisions and the 1890 Act had already delineated the substantive offense.[6] Moreover, since the 1894 Act was appended to the annual river and harbor appropriation bill, it is suggested that there was a limited opportunity for debate and Congress was assured that the bill only prevented discharges which would affect navigation.[7] Although this is all very plausible, it is not a truly satisfactory basis for assuming Congressional oversight of the differences between the 1890 and 1894 statutes. Most probably Congress was primarily concerned with protecting the navigability of navigable waterways, but that is not to say it was exclusively so concerned. As the Supreme Court has said, " &ast; &ast; &ast; the 'serious injury' to our watercourses &ast; &ast; &ast; sought to be remedied was caused in part by obstacles that impeded navigation and in part by pollution &ast; &ast; &ast;." United States v. Standard Oil Co., 384 U.S. 224, 228–229, 86 S.Ct. 1427, 1429, 16 L.Ed.2d 492. But even if Congress was solely preoccupied with protecting navigability, that would not negate Congressional resolve to forbid the discharges of the listed and other foreign substances regardless of their apparent effect on navigation unless specially permitted. To say that Congress was concerned with protecting navigation is not determinative of the scope of the measures Congress took to effect that protection.

In 1896 the Attorney General construed Section 6 of the 1894 Act "as an absolute prohibition" against the discharge of material which, although conceded to be covered by Section 6, would not have affected navigability. 21 Opinions of the Attorney General 305, 307. The "ore washings" involved, however, would have "destroy[ed] the fish, pollute[d] the water so as to destroy its usefulness for domestic purposes, and injure[d] the scenery along the stream." *Id.* at 306. Although the Attorney General opined that the Secretary of War was required to issue a permit under these circumstances, he indicated no doubt about the proposition that a permit had to be applied for and that the Secretary's judgment, rather than the discharger's, about impairment of navigability was controlling.[8]

---

5. H.Exec.Docs.No.123, 53d Cong., 2d Sess. (1894).

6. Comment, Discharging New Wine Into Old Wineskins: The Metamorphosis of the Rivers and Harbors Act of 1899, 33 Univ. of Pitt.L.Rev. 483, 499 n. 59 (1972).

7. *Id.* at 499–500.

8. The Attorney General's view that the Secretary's discretion extended only to considerations affecting navigability was premised on a restrictive interpretation of Congressional power under the Commerce Clause. However, that interpretation was

Also in 1896, Congress commissioned the Secretary of War to make a compilation of all laws enacted for the protection of navigable waterways and to submit to Congress therewith recommendations "as to revision, emendation, or enlargement of the said laws as, in his judgment, will be advantageous to the public * * *." 29 Stat. 234. The Secretary of War delegated the task to the Chief of Engineers, whose compilation and recommended draft were submitted to Congress.[9] The compilation listed Sections 6 of both 1890 and 1894 Acts, and the recommended draft was an attempt to consolidate these Acts into one Section, which became Section 13 of the Rivers and Harbors Act of 1899.[10]

Section 13 eliminated the enumeration of substances present in both the 1890 and 1894 Acts, substituting for them and their catch-alls the phrase "any refuse matter of any kind or description whatever." Moreover, as noted previously, the first portion of Section 13 was not modified by the navigation-threatening limitation appearing in the 1890 Act; only the second portion contains that modifier. The absence of the navigational effect limitation in the first portion of Section 13 is best explainable on the basis that Section 6 of the 1894 Act contained no such limita-

tion. Even though the phrase "any refuse matter of any kind or description" must be construed in pari materia with the lists of substances found in the earlier Acts (see United States v. Standard Oil Co., supra at 228–229, 86 S.Ct. 1427), it does not follow that only refuse matter which tends to impede navigation is covered. The enumeration in the 1890 Act ends with the catch-all "or other waste of any kind." If only materials with an inherent tendency to impede or obstruct navigation are involved, the modifier "whereby navigation shall or may be impeded or obstructed" is superfluous. The enumeration in the 1894 Act ends with the broader catch-all "or any other matter of any kind." The use of "any other matter of any kind" militates against an overly strict ejusdem generis construction, but in any event, it is obvious that not every discharge of the enumerated substances will tend to affect navigation. For instance, the discharge of "acid" is prohibited, but not every acid will be capable of corroding wharves or ships' hulls.[11] Yet a discharge of any acid without prior approval of the Secretary of War would certainly seem to be squarely in the teeth of the statutory prohibition.

■ Thus it is entirely consistent with defendant's hypothesis that Con-

not universally espoused even at the turn of the century (see Scow No. 36, 144 F. 932, 934 (1st Cir. 1906)) and, although likely, it was not necessarily that of the Fifty-third Congress. In any event, this restrictive interpretation is no longer viable; Congress does have the underlying power enabling the Secretary of the Army to decline to issue a permit on ecological grounds. See, e. g., Zabel v. Tabb, 430 F.2d 199, 203–204 (5th Cir. 1970); Kalur v. Resor, 335 F.Supp. 1, 11–13 (D.D.C.1971).

9. H.R.Doc.No.293, 55th Cong., 2d Sess. (1897).

10. United States v. Standard Oil Co., 384 U.S. 224, 227, 86 S.Ct. 1427, 16 L.Ed.2d 492.

The person who did the actual work of compilation, later Judge Koonce, stated in lecturing on the evolution of the 1899 Act:

"Under Section 10 as well as Section 13 relating to the discharge or deposit of refuse matter in navigable waters, the commission of any of the acts forbidden, not their results, constitutes the offense and the commission subjects the offending party to the prescribed penalty regardless of whether or not there is any actual injury to navigation." Lecture by Judge G. W. Koonce, O.C.E., before the Company Officers Class, The Engineer School, Fort Humphreys, Virginia, April 23, 1926, as reported in "Water Pollution Control Legislation—1971 (Oversight of Existing Program)," Hearings Before the H. Comm. on Pub. Works, 92nd Cong., 1st Sess. 284, 290 (emphasis added).

11. See Warner-Quinlan Co. v. United States, 273 F. 503, 505 (3d Cir. 1921).

gress was only concerned with navigational impairment to construe the scheme of the 1899 Act as prohibiting the discharge of any refuse matter of any kind or description unless the Secretary of the Army determined the matter could have no adverse navigational impact. Indeed, assuming defendant's interpretation, this is a plausible construction because otherwise it would be up to the individual to determine whether his proposed discharge matter could have a tendency to obstruct navigation, and this is surely not a desirable feature if Congress was really intent on remedying the evil of navigational impairments. Much damage could be done by a discharger who considered his discharges harmless to navigation before they were discovered. Moreover, individual, private determination of the capability of refuse matter for affecting navigation is simply inconsistent with the comprehensive language used.

This review of the legislative history of Section 13 of the 1899 Act does not persuade us that the statute means other than what it says. The discharge of any refuse matter, regardless of any apparent effect on navigation, is prohibited in the absence of a permit even if Congress thought at the time of enactment that permits would not or could not be withheld on the ground that the material discharged was merely a pollutant.

■ Defendant also relies on the administrative interpretation of Section 13 as establishing that the officials charged with the administering of the Act did not believe that it applied to discharges which had no navigational effect. It asks us to "give great weight" to the administrative interpretation in determining the scope of the statute. In effect from 1965 through December 1968, the only regulation pertaining to Section 13 was 33 C.F.R. § 209.395 (1967).[12] But that regulation recites the statutory proscription of deposits in navigable waters of "refuse matter of any kind or description whatever" other than sewage. Although it states that the jurisdiction of the Department of the Army "is limited and directed to such *control* as may be necessary to protect the public right of navigation" (emphasis supplied), it does not purport to construe Section 13 as allowing, without permission, discharges of refuse matter which the discharger has determined to have no tendency to affect navigation. It does not suggest that the Secretary of the Army's determination of no navigational effect need not be interposed before any discharge of refuse matter is permissible. Furthermore, it states that the Department has directed "action" under Section 13 only *"principally"* against the discharge of those materials obstructive of or injurious to navigation. This regulation hardly amounts to an administrative interpretation that discharges such as defendant's are *ab initio* outside the reach of the statute's prohibition. The same is true of the 1968 amendment defendant relies on (33 C.F.R. § 209.-200(c)(2).)[13]

---

12. That regulation provided:
 "*Deposit of Refuse.* Section 13 of the River and Harbor Act of March 3, 1899 (30 Stat. 1152; 33 U.S.C. 407), prohibits the deposit in navigable waters generally of 'refuse matter of any kind or description whatever other than that flowing from streets and sewers and passing therefrom in a liquid state'. The jurisdiction of the Department of the Army, derived from the Federal laws enacted for the protection and preservation of the navigable waters of the United States, is limited and directed to such control as may be necessary to protect the public right of navigation. Action under section

13 has therefore been directed by the Department principally against the discharge of those materials that are obstructive or injurious to navigation." 33 C.F.R. § 209.395 (1967).

13. That regulation provides:
 "Section 13 of the River and Harbor Act of March 3, 1899 (30 Stat. 1152; 33 U.S.C. 407) authorizes the Secretary of the Army to permit the deposit of refuse matter in navigable waters, whenever in the judgment of the Chief of Engineers anchorage and navigation will not be injured thereby, within limits to be defined and under conditions to be prescribed by

■ Moreover, in addition to the facial frailty of these regulations as support for defendant's position, earlier court decisions had interpreted the first offense created by Section 13 to have no navigational effect limitation. La Merced, 84 F.2d 444 (9th Cir. 1936); United States v. Ballard Oil Co., 195 F. 2d 369 (2d Cir. 1952); see also United States v. Republic Steel Corp., 362 U.S. 482, 490–491, 80 S.Ct. 884, 4 L.Ed.2d 903. Even if these regulations could be interpreted as defendant would like, administrative interpretation is entitled to little weight in the face of contrary judicial construction.

In sum, we conclude that what defendant characterizes as "pure dicta" in United States v. Standard Oil Co., 384 U.S. 224, 230, 86 S.Ct. 1427, 1430, 16 L. Ed.2d 492, was not ill-considered. There the Supreme Court stated that as used in Section 13 of the Refuse Act of 1899, "[t]he word 'refuse' includes all foreign substances and pollutants apart from those 'flowing from streets and sewers and passing therefrom in a liquid state' into the watercourse." We so hold in accord with our sister Circuits which have faced the same question. United States v. Pennsylvania Industrial Chemical Corp., 461 F.2d 468, 471 (3rd Cir.

1972), certiorari granted, 409 U.S. 1074, 93 S.Ct. 689, 34 L.Ed.2d 662; United States v. Ballard Oil Co., 195 F.2d 369, 371 (2d Cir. 1951); La Merced, 84 F.2d 444, 446 (9th Cir. 1936).[14]

### Accommodation of Refuse Act of 1899 and Amended Federal Water Pollution Control Act of 1948

Defendant contends that the Refuse Act of 1899 and the Federal Water Pollution Control Act of 1948, as amended at the time of the discharges in question by The Water Quality Act of 1965,[15] (particularly 33 U.S.C. §§ 1151 and 1160), must be accommodated. First it argues that together they mean "that the Corps of Engineers should continue to have the power to deal with the dumping of waste matter having the potential to affect navigation under § 407 [Section 13 of the 1899 Act], while the problem of water pollution generally is to be dealt with through resort to the Federal Water Pollution Control Act, as amended." Alternatively defendant contends that those discharges of effluent industrial waste which do not violate the applicable Federal Water Quality Standards and Implementation Plan should be considered outside the purview of "refuse matter" in the 1899 Act.

him. Although the Department has exercised this authority from time to time, it is considered preferable to act under Section 4 of the River and Harbor Act of March 3, 1905 (33 Stat. 1147; 33 U.S.C. 419). As a means of assisting the Chief of Engineers in determining the effect on anchorage of vessels, the views of the U.S. Coast Guard will be solicited by coordination with the Commander of the local Coast Guard District." 33 C.F.R. § 209.200(e)(2).

14. Defendant relies on dicta in Guthrie v. Alabama By-Products Co., 328 F.Supp. 1140 (N.D.Ala.1971), affirmed, 456 F. 2d 1294 (5th Cir. 1972), which held that 33 U.S.C. § 407 did not create a federal cause of action in favor of private plaintiffs claiming pollution damage to their riparian lands. It did not focus on the issue here. Bass Angler Sportsman Soc'y v. United States Steel Corp., 324 F.Supp. 412 (S.D.M.D. & N.D.Ala.1971), affirmed, 447 F.2d 1304 (5th Cir. 1971), also relied

on by defendant, held that no "qui tam" action to recover fines imposable under 33 U.S.C. § 411 for violations of 33 U.S.C. § 407 could be maintained. This holding is not revelant to the present issue. See Jacklovich v. Interlake, Inc., 458 F.2d 923 (7th Cir. 1972). Finally, defendant adverts to Kalur v. Resor, 335 F.Supp. 1 (D.D.C.1971), which held that the Secretary of the Army's permit regulations of April 7, 1971, 33 C.F.R. § 209.131, were beyond statutory authorization insofar as they covered non-navigable tributaries. Its holding is likewise not relevant here.

15. The Federal Water Pollution Control Act of 1948 underwent further amendment in 1966 (80 Stat. 1246), but that amendment is immaterial here. Subsequent to the discharges in question, the Act was again amended in 1970 (84 Stat. 91), and was thoroughly revised in 1972. See 33 U.S.C. § 1251 et seq.

■■ We do not see the necessity for any accommodation. The two statutes are not irreconcilable if the coverage of the Refuse Act of 1899 extends to discharges of pollutant refuse matter, as we have determined it does. Cf. Askew v. American Waterways Operators, 411 U.S. 325, 93 S.Ct. 1590, 36 L.Ed.2d 280. Had defendant secured a discharge permit, it could not have been in violation of the 1899 Act, and any pollution abatement recourse the Government would have had would only be under 33 U.S.C. § 1160. True, compliance with federal water quality standards developed under the amended Federal Water Pollution Control Act would not immunize defendant from prosecution for discharges without a permit under the 1899 Act. However, "[i]t is crucial to note that beginning with the Water Pollution Control Act of 1948, Congress has on four separate occasions in the past 24 years specifically stated that section 407 of the Rivers and Harbors Act, banning 'any refuse matter,' was not affected by the subsequent legislation." United States v. Pennsylvania Industrial Chemical Corp., *supra*, 461 F.2d at 472–473. See 33 U.S.C. § 1174. It may be hypothesized that Congress was unaware of the scope of the Refuse Act of 1899 when it consistently preserved its vitality, but in view of the Act's all-encompassing language and the existence of the early *La Merced* and *Ballard Oil Co.* decisions, as well as the *Standard Oil Co.* pronouncement prior to the latest preservation in 1970, this is a doubtful hypothesis. The Third Circuit has pointed out the Acts' consistency on the assumption that they "were designed to accomplish what may be viewed as the same end by different means." United States v. Pennsylvania Industrial Chemical Corp., *supra* at 473. But even if when enacting and amending the Federal Water Pollution Control Act of 1948 while preserving the Refuse Act of 1899 Congress saw the latter as a "navigational statute," that hardly means Congress thought pollutant discharges were outside of the Refuse Act's embrace. On the contrray, it would seem

that explicitly preserving the 1899 Act's vitality in the context of anti-pollution legislation manifests recognition of the statutes' overlapping coverage. Notably in 1970 Congress directed the Secretary of the Army not to issue any permit unless applicable water quality standards were complied with. 33 U.S.C. § 1171(b)(1). Of course, it is foolhardy to purport to be able always to divine the intentions and assumptions of Congress. But we perceive no conflict so irreducible or evidence of Congressional intent so strong as to nullify application of "the cardinal rule that repeals [of legislation] by implication are not favored." *Id.* quoting from Lynch v. Household Finance Corp., 405 U.S. 538, 549, 92 S.Ct. 1113, 1120, 31 L.Ed.2d 424.

## Consistency of Defendant's Convictions with Congressional Intent and with Due Process

■ Defendant argues that even if its discharges are within the proscription of Section 13 of the Refuse Act, its convictions are "contrary to the intention of Congress" because no regulatory permit program under Section 13 existed in 1967 at the time of the discharges. Relying on the Third Circuit's decision in United States v. Pennsylvania Industrial Chemical Corp., *supra*, it contends that in enacting Section 13 Congress intended to establish a regulatory program and in enacting The Water Quality Act of 1965 Congress must have contemplated the existence of such a program under Section 13 or, because of their incompatibility, it would not have preserved the latter statute.

However, Section 13 does not speak in terms of a regulatory permit program. Straightforwardly it provides that upon prior application the "Secretary of the Army * * * may permit the deposit of any material above mentioned in navigable waters * * *." Section 13 may be contrasted with Section 11 (33 U.S.C. § 404) which specifically contemplates, though does not mandate, a regulatory program. See 33 U.S.C. § 406. And, even under the authority of Sec-

tion 4 of the Rivers and Harbors Act of 1905, 33 U.S.C. § 419, "the establishing of a permit program by the Secretary of the Army and the Chief of the Corps of Engineers is discretionary with them as opposed to mandatory."[16] Bass Anglers Sportman Soc'y v. United States Steel Corp., 324 F.Supp. 412, 416 (S.D., M.D. & N.D.Ala.1971), affirmed, 447 F.2d 1304 (5th Cir. 1971). If defendant's argument is correct, then it would follow that the discharge of anything—navigation threatening or not—is permissible so long as no permit program has been instituted. This stands the statute on its head. Clearly the statute generally proscribes refuse discharges unless in any instance the Secretary of the Army has exercised his discretion to permit it.

■ Furthermore, the efficacy of the Refuse Act of 1899 is not dependent upon its being construed to embody a formal regulatory program in order to make it compatible with subsequent anti-pollution legislation. After enactment of The Water Quality Act of 1965 allowing discharges which met minimum water quality standards, it could make no difference in terms of the general prohibition of the 1899 Act whether the Secretary of the Army determined the effect of a proposed discharge on navigation on an *ad hoc* basis or pursuant to a formal regulatory permit program. When in 1970 Congress instructed federal licensing or permitting agencies to disapprove proposed discharges which failed to meet applicable water quality standards (33 U.S.C. § 1171(b)(1)), that did not undermine the across-the-board prohibition of refuse matter discharges absent the Secretary's issuance of a permit therefor. And this limitation on the Secretary's permit power is not substantively affected by the manner in which the permit power had theretofore been exercised. Indeed implementation of the water quality restrictions was accomplished through the institution of the Refuse Act Permit Program by Executive Order 11574 in December of 1970,[17] but the fact that practical implementation of the 1970 water quality limitations necessitated a formal administrative permit program is not a sufficient reason to say that the previous absence of such a program rendered the general prohibition of the 1899 Act nugatory. Simply put, neither the 1965 nor the 1970 Act created a right to discharge refuse matter which did not theretofore exist.

■ Defendant would equate the absence of a regulatory permit program with the non-availability of a permit but cannot make that equation balance. Defendant does not contend that it ever applied for a permit and was refused, but rather argues that any application would have been unavailing. However, subsequent to the decision in United States v. Republic Steel Corp., 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903, in May 1960, and prior to the time of defendant's discharges, at least four permits for the discharge of industrial waste were issued, three of which were issued by the Chicago District of the Corps of Engineers—the District having jurisdiction over the Grand Calumet River—to steel producers in the Chicago area allowing the discharge of treated process water into the Calumet River.[18] Although these permits were issued as part of the settlement of the *Republic Steel Corp., supra,* litigation, they militate against indulging in defendant's assumption that a permit application would have

---

16. 33 U.S.C. § 419 provides, in pertinent part:

"The Secretary of the Army is authorized and empowered to prescribe regulations to govern the transportation and dumping into any navigable water, or waters adjacent thereto, of * * * refuse materials of every kind or description, whenever in his judgment such regulations are required in the interest of navigation."

17. 35 Fed.Reg. 19627 (Dec. 25, 1970); 3 C.F.R. p. 309 (1973).

18. "Effects of Mercury on Man and the Environment," Hearings Before the Subcomm. on Energy, Natural Resources, and the Environment of the S. Comm. on Commerce, 91st Cong., 2d Sess., pt. 2 at 168, 201 (1970).

been unavailing. This Court has previously recognized the Secretary of the Army's ability to grant a permit on an individual application in the absence of a formal permit program (United States v. Republic Steel Corp., 286 F.2d 875, 879 (7th Cir. 1961)), and we think defendant was not entitled to assume a permit was unavailable. See Poulos v. New Hampshire, 345 U.S. 395, 410 n. 13, 73 S.Ct. 760, 97 L.Ed. 1105.

Since defendant cannot successfully assert a defense that no permit was available, it is unnecessary to consider whether its conviction violated due process if it could not obtain a permit. However, we note that the First Circuit has, with cogency, rejected such a claim. United States v. Granite State Packing, 470 F.2d 303, 304 (1st Cir. 1972).

■ Next defendant contends that its conviction violated due process because the Army Corps of Engineers had publicly stated that the Grand Calumet River was not a navigable water of the United States over which it exercised "active" jurisdiction. However, the two statements defendant points to, Exhibits C and D, both properly excluded from evidence (see *infra*), do not support defendant's reliance. The first statement bore the date of April 8, 1969, one and a half years after the discharges in question. The second statement refers to those bodies of water over which bridges cannot be built without advance approval of the Secretary of the Army. Neither statement purports to be a definitive list of navigable waterways within the District.

*Evidentiary Rulings*

■ The defendant assails various evidentiary rulings of the trial court. First under attack are the admissions of Government Exhibits 1 through 7 and 13. The basis of the challenge is their belated disclosure to defense counsel. On June 1, 1970, in its discovery motion, defendant sought to inspect and copy any documents in the Government's possession "which the government will introduce at the trial of this case or which

contain information or evidence favorable to the defendant * * *." The Government agreed to comply. Although the trial was first set for November 30, 1970, the cause was not actually called for jury trial until October 6, 1971. The Government's case was tried by Assistant United States Attorney Flynn of Hammond, Indiana, and James Moore of the Department of Justice in Washington, D.C. Mr. Moore came into possession of certain documentary material on the issue of the navigability of the Grand Calumet River in late September 1971. We are advised that the first time that Moore, Flynn and their navigability witness, Peter Machinis of Chicago, had an opportunity to discuss the documents together was on Tuesday morning, October 5, 1971, in Hammond. Defendant admits the receipt of copies of Exhibits 1, 2, 3, 5, 6 and 7 on that afternoon. As the district judge permissibly stated in admitting these exhibits and Exhibit 4, which was first shown to defense counsel on the morning of October 6th before trial commenced:

"The [discovery] motion did not require any materials that the Government may have pertaining to this case, but asks for materials which the Government will introduce at the trial. Until the Government makes that determination to use it, or introduce, or attempt to introduce it at the trial, there was no duty to disclose."

Moreover, as the district judge also stated, defense counsel made no prompt motion for a continuance on the ground that there was inadequate opportunity properly to analyze or assess the material.

Exhibit 13, which was a compilation of Exhibits 1, 2 and 3 and was prepared by government witness Machinis and his assistant Mr. Kloker, was also received in evidence over defendant's objection. Exhibit 13 was first exhibited to defense counsel on October 6th before the opening of the trial. It was prepared on October 1st in six hours, the same day that Machinis received the underlying

Exhibits 1, 2 and 3. Copies of Exhibit 13 did not come out of the reproduction room until October 2d, and the first time government trial counsel saw them was on Tuesday October 5th, the day before the trial commenced. Although, as noted, the compilation was not made available to defendant's counsel until just before the start of the October 6th trial, the basic Exhibits 1, 2 and 3 had been given to defense counsel the day before.[19] Mr. Machinis did not take the stand until October 7th. Our study of the transcript shows that defendant's trial counsel was able to cross-examine him thoroughly as to the navigation exhibits.

Defendant did not begin its case in chief until October 11th and could have recalled Machinis as its witness or secured another surveyor to testify concerning the exhibits in question. Furthermore, exhibits of this nature were equally available to defense counsel. Since these documents were produced under the discovery motion as documents "which the government will introduce at the trial," defense counsel was on notice of their prospective use. Therefore, the district judge was justified in overruling as untimely a motion for continuance made after the empaneling of the jury.

We hold that the court's rulings with respect to the admission of these eight exhibits did not amount to an abuse of discretion. Defendant has not shown that the Government decided to use the exhibits substantially before they were exhibited to defendant. Similar documentary materials were available to defendant. There is no showing of prejudice, and any right to continuance came too late. In these circumstances, Rule 16(g) of the Federal Rules of Criminal Procedure did not require the district court to impose an exclusionary sanction upon the Government. See Hansen v. United States, 393 F.2d 763, 770 (8th Cir. 1968).

Defendant asserts that the district court improperly excluded its Exhibits C and D. These exhibits were offered on the issue of navigability and as support for defendant's theory that the Government was, in effect, estopped under pain of due process from claiming the river was navigable. Exhibit C consisted of an April 8, 1969, Army Corps of Engineers public notice listing certain waterways within the Chicago District where the Corps of Engineers exercises "active jurisdiction" against obstructions to navigation and requires work permits under Section 10 of the Refuse Act (33 U.S.C. § 403). The portion of the Grand Calumet River adjacent to defendant's plant is not listed. Exhibit D is a May 9, 1958, public notice of the Army Corps of Engineers showing navigable waters in the Chicago District where the Secretary of the Army's approval is needed for plans for bridges. The span next to the defendant's plant on the Grand Calumet River is not included.

This case was tried on the theory that the Grand Calumet River was navigable in its state of nature and must therefore be deemed navigable thereafter as a matter of law. Economy Light & Power Co. v. United States, 256 U.S. 113, 41 S. Ct. 409, 65 L.Ed. 847; United States v. Appalachian Elec. Power Co., 311 U.S. 377, 408, 61 S.Ct. 291, 85 L.Ed. 243. Defendant does not challenge this legal proposition. The district court correctly excluded Exhibit C because whether the Corps of Engineers exercised control of works on a particular waterway would not be determinative of whether the waterway is navigable in the legal sense.

---

19. The district court refused to receive Government Exhibits 16 and 17 into evidence because of their late disclosure on the morning the trial commenced. Exhibits 4 and 13 were admitted despite equally late disclosure, apparently because Exhibit 4 was just an additional map and because Exhibit 13 was just a compendium of Exhibits 1, 2 and 3. Furthermore, no separate objection appears to have been made that Exhibit 4 was not displayed to defendant until October 6th.

Furthermore, the exhibit was issued in 1969 and did not relate to the navigability of the river at the time of these 1967 offenses and, as the district judge remarked, would "only tend to confuse the jury."

Exhibit D listed certain bodies of water under the heading "Navigable Waters of the United States Within the U.S. Army Engineer District, Chicago, Illinois, Requiring Approval of Bridge Plans by the Secretary of the Army." The text of the document was to the effect that advance approval for the building of bridges over waterways in the Corps' Chicago District would no longer be necessary except as to specifically listed waters. The district court was correct in stating "this document has nothing whatsoever to do with navigability and does not so indicate."

The Government's historical evidence evidently satisfied the jury that this portion of the Grand Calumet River was once a navigable river. Once found to be navigable, the water remained so. Economy Light & Power Co., *supra*. Exhibits C and D were properly excluded as not material to the determination of navigability in law.

With respect to the other purpose for which the exhibits were offered —to establish the existence of an administrative policy to treat the Grand Calumet River as non-navigable and thereby estop the Government from claiming defendant should have applied for a permit —the exclusion was likewise correct. Exhibit C was properly excludible by virtue of its chronology alone; defendant hardly could have relied on the 1969 notice in 1967. Upon thorough examination of Exhibit D, the court below correctly found, "it certainly is not an indication of any policy by the Corps of Engineers to the effect that those [waters] over which the prior approval of bridges will not be required [are] considered by them as nonnavigable." It was stipulated that between the date of Exhibit D in May 1958 and that of Exhibit C in April 1969, there were no known public notices dealing generally with the subject of navigable waters.

We have considered the remaining arguments asserted by defendant and deem them to be without merit. Therefore, the judgment is affirmed.

Affirmed.

Before SWYGERT, Chief Judge, and CUMMINGS and STEVENS, Circuit Judges.

## ON APPELLANT'S PETITION FOR REHEARING.

### ORDER

In support of its petition for rehearing defendant argues, in part, that the Supreme Court's recent opinion in United States v. Pennsylvania Industrial Chemical Corp., 411 U.S. 655, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973), requires that defendant have the opportunity to prove that it was affirmatively misled by regulations and other official pronouncements of the Corps of Engineers into believing that 33 U.S.C. § 407 did not apply to its discharges. However, in that case the defendant offered to prove at trial that it relied in good faith on 33 C.F.R. § 209.395 (1966) and 33 C.F.R. § 209.200(e)(2) (1969) in concluding its discharges were permissible under law, and it raised the exclusion of such proof as an issue on appeal. Here, in contrast, although defendant invokes the same regulations, it has pointed to no attempt in the trial below to prove that it actually relied upon them in making its discharges,* and on appeal defendant utilized those regulations solely in an effort to establish an administrative interpretation to which, it argued, the Court should give great weight in construing 33 U.S.C. § 407. It did not argue that it had relied on these regulations in discharging the refuse matter, nor did it argue that any proof of reliance thereon was submitted and improperly

---

* The latter regulation was promulgated after the discharges in question.

454

excluded below. Insofar as Exhibits C and D are concerned, for the reasons set forth in the Court's opinion, their exclusion from evidence was justified. Had they been admitted, they could not have formed a sufficient basis to justify reasonable reliance, as the district court indicated in its ruling.

The petition for rehearing is denied.