Arthur J. HORWITZ, Plaintiff,

v.

Peter J. SPRAGUE, Ronald Avis and James L. D. Roser, Defendants.

No. 75 Civ. 3436 (CHT).

United States District Court, S. D. New York.

Nov. 17, 1977.

Landay & Miller, New York City, by Daniel R. Pinello, New York City, for plaintiff.

Robert Beshar, New York City, for defendant Peter J. Sprague.

Ginzburg, Gaines, Gaines, DeBoissiere & Newman, by Robert J. DeBoissiere, Staten Island, N. Y., for defendant Ronald Avis.

Kenneth T. Wasserman, New York City, for defendant James L. D. Roser.

## MEMORANDUM

TENNEY, District Judge.

The production of a motion picture based on the Hermann Hesse novel *Steppenwolf* has generated litigation within this Court's diversity jurisdiction. 28 U.S.C. § 1332. Plaintiff Arthur J. Horwitz contends that he was defrauded out of his rightful share in the motion picture project by defendants Peter J. Sprague, the eventual producer of the movie, and two initial investors in the project, Ronald Avis and James L. D. Roser. All defendants have now asked, *inter alia*, for summary judgment pursuant to Rule 56(b) of the Federal Rules of Civil Procedure ("Rules"); [1] plaintiff has moved to disqualify certain of defendants' counsel pursuant to Disciplinary Rule 5–102(A) and Canon 9 of the Lawyer's Code of Professional Responsibility of the New York State and American Bar Associations; and defendants Avis and Roser have counterclaimed for damages in prima facie tort based on the plaintiff's initiation of this litigation. For the reasons stated below, the Court grants summary judgment for defendants and therefore need not reach defendants' alternative requests. Summary judgment renders the plaintiff's motion to disqualify defendants' counsel moot, and the motion is therefore dismissed. Defendants' counterclaim labelled prima facie tort is likewise dismissed.

The tale of the *Steppenwolf* motion picture financing, while not nearly as richly textured as the literary work which inspired it, has, nevertheless, a cast of characters and a plot line which require some persistence to unravel. On August 11, 1969, Richard A. Herland and Melvin Fishman purchased an option from Suhrkamp Verlag KG ("Suhrkamp"), Frankfurt, Germany, on the right to develop and produce a motion picture based on the novel *Steppenwolf*. The option ran for 12 months and could be extended for an additional 12 months upon payment of an additional option fee. By the terms of the option agreement, a substantial sum was due upon exercise of the option, and another substantial payment was due when filming commenced or 12 months after exercise, whichever came first. In the agreement with Suhrkamp, Herland and Fishman designated Stewart Capital Corp. ("Stewart Capital") as their negotiating agent.

Some six months later, on March 4, 1970, Herland and Fishman, by now formally referring to their partnership as Herman Productions, entered into a joint venture agreement ("1970 Joint Venture Agreement") with Dubar Productions, another partnership comprising Jackson Dube and plaintiff Horwitz. The purpose of the joint venture was to "endeavor to enter into various agreements arranging for the financing, production and distribution of the Picture," i. e., *Steppenwolf*, 1970 Joint Venture Agreement ¶ 5. The association among Herland, Fishman, Dube and Horwitz was styled "Steppenwolf Productions." [2] Al-

---

1. Defendants have asked in the alternative for the joinder of Richard Herland as an indispensable party pursuant to Rule 19(b) of the Federal Rules of Civil Procedure; for attorneys' fees, pursuant to Rule 11; and for a protective order against further discovery by plaintiff.

2. By the terms of the 1970 Joint Venture Agreement "except as specifically provided to the contrary herein, none of the Venturers shall sell, assign, transfer, mortgage, pledge, hypothecate or otherwise dispose of any right, title or interest in the joint venture or in and to the Picture." *Id.* ¶ 13.

though the 1970 agreement was nominally between Herman Productions and Dubar Productions, all four venturers signed it individually.

What transpired in the next year is unknown to the Court, but it is safe to say that someone made the payment necessary to keep the Suhrkamp option alive and that Steppenwolf Productions continued to seek financing for the movie. Although Stewart Capital, the initial agent named by Herland and Fishman to deal with Suhrkamp, is nowhere mentioned in the 1970 agreement, it was apparently still interested in the project, because the next pertinent flurry of activity, indeed the genesis of this dispute, involves Stewart Capital as well as Steppenwolf Productions.

On July 29, 1971, almost two years after the purchase of the initial option on the *Steppenwolf* rights and just prior to the expiration thereof, Stewart Capital sent a letter entitled "Proposed Basis for Proceeding with STEPPENWOLF Financing" to the Steppenwolf Productions joint venture ("July 29th Proposal"). This document outlined possible funding in aid of exercising the *Steppenwolf* option before it expired on August 11, 1971. Plaintiff's Exhibit (b). The letter was signed by the four venturers who comprised Steppenwolf Productions, including plaintiff by his own hand and Herland signing as attorney in fact for Melvin Fishman. The proposed financing agreement contemplated the possible creation of a new *Steppenwolf* business entity to facilitate receipt of outside investment capital and alluded to the possible participation of two investors, each of whom would contribute $60,000. As an incentive, the first investor was to receive an allocation of partnership losses and become a new coventurer or member of the new *Steppenwolf* business entity; the second would have some income from eventual distribution of the film but was to be in effect a lender whose $60,000 loan would be collateralized, at least as far as the July 29 proposal stated, by escrowed promissory notes aggregating $85,000, such notes, "in the case of

Messrs. Herland and Fishman, to be further secured by their pledge to [Stewart Capital] of their proportionate equity share (which is understood to be 62.5% of STEPPENWOLF Productions)." July 29th Proposal ¶¶ i, iv. The same document provided that if the joint venture did not obtain certain additional financing commitments by October 1, 1971, the promissory notes would become due and payable within forty days, "provided, however, for a period of five calendar days thereafter Arthur Horwitz shall have the right to pay the amount of the Herland and Fishman notes." *Id.* ¶ viii.

Apparently this precise method of financing never materialized, but in short order substitute financing was found and a new *Steppenwolf* business entity, Steppenwolf Service Company ("Steppenwolf Service"), was formed.

The crucial events occurred on August 5, 1971, six days before the Suhrkamp option was to lapse. On that date two documents were signed, although it is not apparent in what order. By one document Steppenwolf Service Company was formed as a limited partnership among Steppenwolf Productions (*i.e.*, Herland, Fishman, Dube and plaintiff Horwitz), Stewart Capital and one Joseph Baldwin, whose role was apparently that of the first investor in the contemplation of the July 29th Proposal. Herland signed the limited partnership agreement in behalf of Steppenwolf Productions, which had status as a general partner in the new entity. This document states specifically: "Steppenwolf Productions, as one of the General Partners, shall contribute all of its right, title and interest in and to the Steppenwolf movie project" as its "Contribution to Capital." Defendants' Exhibit D, Art. VI, ¶ 6.1.

On the same date, August 5, plaintiff by his own hand signed a separate document prepared by Stewart Capital entitled "Steppenwolf Initial Financing, Guaranty and Escrow Agreement" ("August 5th Agreement"). This is the critical instrument and the one which plaintiff claims operated as a

fraud on him. The August 5th Agreement purports to be an understanding with respect to the initial *Steppenwolf* movie financing by Baldwin (the investor) and defendants Roser and Avis (the lenders) and contains corresponding guaranties by plaintiff and his co-venturers. Paragraph (i) of the August 5th Agreement refers to the new limited partnership Steppenwolf Service and states that "the Articles of [Steppenwolf Service Company] are attached hereto as Exhibit A." Paragraph (iii) of the August 5th Agreement recites: "Messrs. Roser and Avis hereby each loan Steppenwolf Services [sic] $30,000, which loans are evidenced by non-negotiable, secured, interest bearing notes in the form attached hereto as Exhibits B and C, respectively." Thus, by these terms, Steppenwolf Service, which now owned the rights to produce the movie, gave Avis and Roser a security interest in those rights. Paragraph (x) provides additional security for the Avis and Roser loans in the original form contemplated by the July 29th Proposal, to wit, personal notes from Horwitz, Herland and Fishman in escrow, in the amount of $85,000, to become due and payable if additional financing for the *Steppenwolf* movie was not obtained, and with the reservation to Horwitz of the option to assume Herland and Fishman's personal obligations and rights if they defaulted on these loans.[3] At this point, then, the Roser and Avis loans were secured by two separate sets of notes: personal notes from plaintiff, Herland and Fishman, and notes from Steppenwolf Service.[4]

Thereafter, although the Suhrkamp movie option was exercised, the requisite financing for the continuation of the project was not obtained and, pursuant to Paragraph (x) of the August 5th Agreement, the personal notes came due, as did the Steppenwolf Service notes referenced in Paragraph (iii). Plaintiff did not exercise his right to pay the personal notes of Fishman and Herland; indeed, he apparently has not paid his own. Roser Deposition 17. Plaintiff does not claim that he, or any of his co-venturers, or Steppenwolf Service paid anything due and owing to Avis or Roser, or paid anything to meet the further commitment on the now-exercised Suhrkamp option. In fact the Suhrkamp obligation was apparently fulfilled and the movie project rescued by Roser and Avis through their payment of the second installment due Suhrkamp in 1972. *Id.* at 34. By now, defendants Avis and Roser had put up $144,000. *Id.* at 49–50. Ultimately, on June 11, 1973, Avis and Roser (and the original optionees Fishman and Herland) assigned and quitclaimed all interest in the *Steppenwolf* movie project to defendant Sprague, apparently relying on the right which devolved to them through the default on the Steppenwolf Service notes. Consideration for this assignment flowed only to Avis and Roser (defendants explain that Fishman and Herland joined in the quitclaim because the original contract with Suhrkamp was negotiated in their names alone. Defendants' Reply Memorandum 5). Sprague subsequently produced the *Steppenwolf* movie.

On July 15, 1975, plaintiff commenced this litigation naming the original lenders, Roser and Avis, and the subsequent producer, Sprague, as defendants and requesting an accounting for damages and injunctive relief based on fraud and unjust enrichment. Plaintiff claims that when he signed

---

3. The terms of these personal notes apparently echo the totality of the financing arrangement contemplated by Stewart Capital's July 29th Proposal. Plaintiff suggests, without specifically articulating belief, or presenting support for such belief, he assumed that the August 5, 1971 agreement was also collateralized only by these personal notes.

4. The Steppenwolf Service notes were to mature on or before Dec. 1, 1971 and recite as collateral:

"All property interests, receivables or other assets of any nature belonging to or acquired by the Maker at any time and from time to time during the term of this Note, including without limitation the screenplay and property rights to the Steppenwolf movie project belonging to the Maker or subject to its control or the control of the individuals who manage the project."
Defendants' Exhibits E and F. The notes are dated August 5, 1971.

the August 5th Agreement his copy did not have annexed to it either the Articles of Limited Partnership of Steppenwolf Service (Exhibit A to the August 5th Agreement) or the notes executed by Herland in the name of Steppenwolf Service (Exhibits B and C to the August 5th Agreement). Plaintiff disclaims knowledge that Steppenwolf Service was, after the document memorializing its formation as a limited partnership, the repository of all rights to the *Steppenwolf* movie property and that what he signed effectively put up those rights as collateral for the Avis and Roser loans. He claims that transfer of all right, title and interest in the *Steppenwolf* movie from the old Steppenwolf Productions to the new Steppenwolf Service was, in any event, an illegal act. Defendants contend that Horwitz's version of the facts is false and untenable and that as a matter of contract law he was bound by what he signed.

 The simplicity of the contract law on which defendants stand contrasts beguilingly with the intricacy of the facts in this case. No legal proposition could be more basic than that one who is competent to enter a contract is normally bound by it; few axioms more venerable than that the manifest, rather that the personal, intent of a party controls in the formation of a contract. However, plaintiff has invoked a magic word—fraud—and it is likewise elementary that any contract can be set aside for fraud, or that a defrauded party can retain the consideration he received and bring an action at law to recover his damages. *duPont v. Perot,* 59 F.R.D. 404 (S.D.N.Y.1973). By casting this complaint in tort, *i. e.,* fraud, plaintiff has avoided the perils of the parol evidence rule which would likely bar oral evidence to vary the terms of so explicit an instrument as the August 5th Agreement which plaintiff signed.

"[A] claim arising out of [a fraudulent inducement to enter a contract] is considered to rest upon an independent tor-

tious act. The plaintiff sues not for any breach of contract but for injuries suffered as a result of the defendants' conduct which is separate and distinct from the formal contract. Consequently, a party seeking to prove fraudulent inducement may introduce evidence which has the effect of varying the terms of a written contract, the parol evidence rule notwithstanding."

*Plum Tree, Inc. v. N. K. Winston Corp.,* 351 F.Supp. 80, 85 (S.D.N.Y.1972) (citations omitted). Therefore, this Court must look to the law of fraud, rather than of contract, in deciding this dispute although even via this route plaintiff cannot prevail.

 It is precisely because the allegation of fraud is so potent a weapon that Rule 9 mandates that "the circumstances constituting fraud or mistake shall be stated with particularity." The elements of actionable fraud include the misrepresentation, concealment or nondisclosure of a material fact, scienter, reliance and damage. *United States v. Franklin National Bank,* 376 F.Supp. 378 (E.D.N.Y.1973); *Keers & Co. v. American Steel & Pump Corp.,* 234 F.Supp. 201 (S.D.N.Y.1964). These elements are simply not present in plaintiff's complaint or supporting deposition. The former merely recites the events which led to the eventual production of the movie and reiterates the claim that plaintiff was defrauded when he signed the August 5th agreement that secured the Avis and Roser loan with the *Steppenwolf* movie rights. Plaintiff's deposition is likewise conclusory and insubstantial. Plaintiff repeats that he never saw the documents purportedly appended to the agreement he signed and states that he told various people involved in the deal that "at no time would I ever put up my rights as collateral." Horwitz Deposition 11. None of the people named by plaintiff as having heard this declaration is a defendant in this action.[5] Finally, plaintiff asserts that transfer of all right, title and interest in the move from Steppenwolf Productions to Steppenwolf Ser-

---

5. Plaintiff claims not to have been aware that there were notes from Steppenwolf Service to Avis and Roser, or that Steppenwolf Service had any property with which to back the notes.

Yet Horwitz clearly knew that Steppenwolf Service had been formed and why, and he exhibits a fulsome perception of the exigencies of the financing situation around the time that

vice "would be what I consider to be an illegal act because the Articles of Steppenwolf Productions specifically prohibits such an act." *Id.* at 7.[6] The last contention is surely a matter for argument only between plaintiff and his co-venturer, Herland, who signed the document assigning those rights. It cannot form the basis of a charge of fraud on the part of the defendants whom plaintiff has sued. (Herland is not a defendant in this action; no Herland statement is presented to the Court.)

These allegations focus only on plaintiff's perceptions and on plaintiff's statements. By contrast, both complaint and deposition are utterly devoid of any substantiated allegation of improper conduct on the part of any of the named defendants, nor is there any assertion that any defendant or one acting in concert with him made any statement on which the plaintiff relied. There is not one fact presented to support the notion that the defendant investors—solicited *by* plaintiff's group and not vice versa—misled Horwitz in some vaguely hinted-at cabal to defraud him of his interest in the *Steppenwolf* movie. Plaintiff signed a document that made clear reference to other documents which, if he had inquired about them, would have revealed to him the nature of his obligation. "[I]f the plaintiff has been furnished with the means of knowledge and he is not prevented from using them he cannot say that he has been deceived by the misrepresentations of the other party." *Frigitemp Corp. v. Financial Dynamics Fund, Inc.,* 524 F.2d 275, 282 (2d Cir. 1975). It has been held that a party is bound to the terms of a document written in a foreign language where the plaintiff alleged that

he asked for a translation and did not receive one. *Gaskin v. Summ Handel GmbH,* 390 F.Supp. 361 (S.D.N.Y.1971) (plaintiff could not resist a motion for dismissal by alleging fraud without demonstrating what, if any, independent efforts he exercised to secure complete understanding of the contract he signed). Even viewing every fact in the light most favorable to the plaintiff, *U. S. v. Diebold,* 369 U.S. 364, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962), and accepting as true that the clearly referenced appendices to the August 5th Agreement were not attached to what plaintiff signed, what is to be said of a plaintiff who did not inquire about the significance of the first and third clauses of a contract written in his own language?

■ There is no question but that summary judgment is a drastic response to litigation, especially in an allegation of fraud, *see* 6 J. Moore, *Federal Practice* ¶ 56.17[27] (2d ed. 1976), and it is fitting that the party seeking summary judgment has the burden of demonstrating the absence of any genuine issue of material fact and his entitlement to a judgment as a matter of law. *Adickes v. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Friedman v. Meyers,* 482 F.2d 439 (2d Cir. 1973). However, the object of the motion is "to discover whether one side has no real support for its version of the facts," *Community of Roquefort v. William Faehndrich, Inc.,* 303 F.2d 494, 498 (2d Cir. 1962), not to encourage procedural exercises rendered impotent by an impossible burden of proof. To the end that the movant's rights are equally protected, Rule 56(e) provides that "an adverse party may not rest upon the

---

Steppenwolf Service was created. He states that the initial financing deal "never went through and the partnership was faced with making payment of sixty thousand dollars for the screen rights to Suhrkamp Verlag A.G." *Id.* at 10. Plaintiff continues:

"At this point, Stewart Capital proposed that they had three investors, two of which would lend money to pay for rights, would lend money to Steppenwolf Productions so that the payment of the [Suhrkamp] rights could be made. . . . Each of them were to receive an interest to the overall Steppenwolf situation, and as collateral, they would receive all of our rights, et cetera, and the

loan which was being paid, later turned out to be paid by Mr. Avis and Mr. Roser. This was to be collateralized by the rights since [the other investor] was getting a 2 or 3 to 1 tax write off.

"That was the purpose of Steppenwolf Service Company."
*Id.* at 11.

6. *See* note 1 *supra.* Elsewhere in his deposition, however, Horwitz demonstrates that he was fully aware that at least Herland and Fishman were collateralizing their personal notes with all their right and title to the *Steppenwolf* movie property. Horwitz Deposition 19.

mere allegations or denials of his pleading, but his response . . . must set forth specific facts showing that there is a genuine issue for trial." *See Dressler v. MV Sandpiper,* 331 F.2d 130 (2d Cir. 1964). This plaintiff has not done. The mere incantation of the word "fraud" without any allegation that *these* defendants did or said anything misleading, or hid from plaintiff any material fact, or induced or even encouraged him to sign the August 5th Agreement without full appreciation of its significance, is simply not enough to withstand summary judgment. *Perma Research & Development Co. v. Singer Co.,* 410 F.2d 572 (2d Cir. 1969); *Nahtel Corp. v. West Virginia Pulp & Paper Co.,* 141 F.2d 1 (2d Cir. 1944); *Wood v. Wood,* 312 F.Supp. 758 (S.D. N.Y.1969).

Plaintiff's Rule 9(g) Statement made pursuant to the General Rules of the United States District Court for the Southern District of New York, the purpose of which is to present a concise list of the genuine issues to be tried, repeats the same immaterial, unsupported allegations of fraud to bootstrap plaintiff into a position where he can challenge the validity of the document he signed.[7] It is of no moment whatever, for example, "[w]hether all of the exhibits to the Initial Financing, Guaranty and Escrow Agreement, dated August 4, 1971 . . . were attached to said document at the time of its execution by the parties thereto," Plaintiff's Rule 9(g) Statement ¶ 1, when it is hornbook law that "[w]here a writing refers to another document, that other document, or so much of it as is referred to, is to be interpreted as part of the writing." W. Jaeger, *Williston on Contracts* § 628 (3d ed. 1961). "It is not necessary, in order to incorporate by reference the terms of another document, that such purpose be stated in haec verba or that any particular language be used." *Lowry & Co. v. S. S. Le Moyne D'Iberville,* 253 F.Supp. 396, 398 (S.D.N.Y.1966).

For the reasons stated, defendants' motion for summary judgment is granted. Plaintiff's cross-motion to disqualify defendants' counsel based on Disciplinary Rule 5–102(A) of the Lawyer's Code of Professional Responsibility is dismissed as moot inasmuch as that directive is aimed at a lawyer who "ought to be called as a witness on behalf of his client," *id.,* and disposition of this matter on summary judgment contemplates that no one will be called as a witness.

■ There remains only the question of defendants Roser and Avis' counterclaim denominated "prima facie tort." Despite this nomenclature, it is apparent that defendants are asserting a claim for malicious prosecution, for the substance of their charge is that the claim against defendants was known to be false and done with malice "and with the intent to compel the defendants Avis and Roser to pay monies when there was no basis in law or fact for a claim against them." Amended Answer ¶ ¶ 26, 27. The law is clear that the prima facie tort doctrine applies only where the injury does not fall into a traditional tort category. *Ruza v. Ruza,* 286 App.Div. 767, 146

---

7. Furthermore, although it is not dispositive of the issue here presented, the Court will not overlook the fact that Paragraph 1 of Plaintiff's Rule 9(g) Statement is not only immaterial, but misleading. Paragraphs 2 and 3 are also suspect. Although plaintiff is careful in paragraph 1 to state that the agreement he signed and on which defendants relied was "dated" August 4, 1971, he then posits in paragraph 2 as an issue to be tried the question "[w]hether plaintiff ever had occasion to see, on or before August 4, 1971, the Articles of Limited Partnership of Steppenwolf Services [sic] Company, dated August 5, 1971." Paragraph 3 purports to raise as an issue "[w]hether plaintiff ever had occasion to see, on or before August 4, 1971, the Non-Negotiable, Secured Promissory Notes of Steppenwolf Services [sic] Company to defendants Avis and Roser, dated August 5, 1971." By these alleged "issues" plaintiff creates the impression that the operative date of his consent to the Avis and Roser loans was August 4, 1971 and that the creation of Steppenwolf Service Company on August 5, 1971 by signature of Herland would suggest that the referenced Articles of Limited Partnership could not possibly have been attached to the agreement Horwitz signed. The fact of the matter is that the critical "August 5th Agreement" was dated August 4, 1971, but *signed* by Horwitz on August 5, 1971, the very same date as his co-venturer Herland signed over the *Steppenwolf* movie rights to Steppenwolf Service Company. Such disingenuousness on the part of the plaintiff does little to bolster his claim that others have defrauded him.

N.Y.S.2d 808 (1st Dep't 1955). Treating the counterclaim as one for malicious prosecution, the Court concludes that it must fail. "The essential elements of such a cause of action, based upon the bringing of a civil suit, are: (1) absence of probable cause; (2) malice; (3) termination of the suit favorably to the claimant; and (4) interference with the claimant's person or property by resort to a provisional remedy such as attachment, arrest, or injunction." *Bercy Industries, Inc. v. Mechanical Mirror Works, Inc.,* 279 F.Supp. 428, 429 (S.D.N.Y.1968), *quoting Rosemont Enterprises, Inc. v. Random. House, Inc.,* 261 F.Supp. 691, 695 n. 11 (S.D.N.Y.1966). Although plaintiff requested a preliminary injunction in his prayer for relief, no such relief ever issued. The tort simply will not lie for the interference with defendants represented by the time and expense of defending this lawsuit. *Luckett v. Cohen,* 169 F.Supp. 808 (S.D.N.Y.1956). Likewise, defendants' motion for attorneys' fees is denied.

So ordered.